UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ENVIRONMENT RHODE ISLAND,
BURTON HOFFMAN, HENRY ROSEMONT, JR.,
DAVID WIXTED, and HENRY T. WROBEL,

Plaintiffs,

CA 08 265

v.

C.A. No. 08-________

CITY OF NEWPORT, and EARTH TECH, INC.,

Defendants

**COMPLAINT**

**NATURE OF THE CASE**

1. This is a citizens' suit to enforce the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (the "Clean Water Act" or the "CWA").

**JURISDICTION AND VENUE**

2. The Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1) and 28 U.S.C. § 1331 and 1367(a).

3. Pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), venue lies in this District because the source of the discharge of pollutants is located within this District.

4. Pursuant to Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), Plaintiffs Environment Rhode Island, Burton Hoffman, Henry Rosemont Jr., David Wixted, and Henry T. Wrobel gave notice of the violations alleged in this Complaint more than sixty days prior to commencement of this lawsuit to: (a) Defendants City of Newport ("Newport") and Earth Tech,

Inc. ("Earth Tech"), (b) the United States Environmental Protection Agency ("EPA"), and (c) the Rhode Island Department of Environmental Management ("RIDEM"). The notice was provided in a letter dated March 12, 2008 (the "Notice Letter") and mailed to these parties on that date. A copy of the Notice Letter is attached as Exhibit 1 and incorporated herein.

5. Neither the EPA nor RIDEM has commenced or is diligently prosecuting an action in state or federal court to redress the Clean Water Act violations alleged herein.

**PARTIES**

6. Plaintiff Environment Rhode Island is a non-profit corporation duly organized under the laws of Rhode Island. Environment Rhode Island is a statewide environmental advocacy organization that is actively engaged in education, research, lobbying, litigation, and citizen organizing to encourage conservation and environmental protection. Environment Rhode Island has approximately 2,300 members in Rhode Island.

7. Environment Rhode Island has members who live and own homes in Newport and who participate in recreational activities in and around nearby Newport Harbor and Easton's Bay. Environment Rhode Island has members who are adversely affected by Defendants' illegal wastewater and storm water discharges. These discharges pose a threat to human health and the environment, and adversely affect the use and enjoyment of these water bodies by Environment Rhode Island's members.

8. Plaintiff Burton Hoffman is a life-long resident of Newport

9. Plaintiff Henry Rosemont Jr. lives in Newport. He is a member of Environment Rhode Island.

10. Plaintiff David Wixted lives in Newport.

11. Plaintiff Henry T. Wrobel lives in Newport. He is a member of Environment Rhode Island.

12. Defendant City of Newport is a municipality incorporated under the laws of the State of Rhode Island. Newport owns a sanitary sewer system, a storm sewer system, a wastewater treatment plant, combined sewer overflow facilities, and associated pumping and interceptor systems and discharge outfalls. Throughout this Complaint, this entire system is referred to as the "Newport System."

13. As the owner of the Newport System, Newport is liable for the violations set forth herein.

14. Defendant Earth Tech, Inc. is a corporation with its headquarters at 300 Oceangate Suite 700, Long Beach, California, 90802. Earth Tech performs engineering services and, in 2000, Newport and Earth Tech entered a long-term contract wherein Earth Tech agreed to operate, maintain, repair, replace, and manage the Newport System. Newport pays Earth Tech approximately three million dollars per year for this service. Earth Tech is a subsidiary of Tyco International Ltd. ("Tyco"). In 2000, Newport and Tyco entered a guarantee agreement wherein Tyco guaranteed the performance by Earth Tech of all of Earth Tech's responsibilities under its contract with Newport.

15. As operator of the Newport System, Earth Tech is liable for the violations set forth herein.

## THE NEWPORT SYSTEM AND ITS WATER QUALITY IMPACT

### A. Newport's Sanitary Sewer System

16. The Newport sanitary sewer system pumps wastewater from domestic, commercial, and industrial sources within Newport and the adjacent Town of Middletown to the Newport Water

Pollution Control Plant ("Newport WPCP"), where it is treated prior to discharge to Newport Harbor. Certain of Newport's storm drains are connected to the City's sanitary sewer system, and thus storm water also is pumped to the Newport WPCP for treatment and discharge. During the past five years, the Newport WPCP has treated and discharged an average of 9.7 million gallons per day ("MGD") of wastewater (or wastewater mixed with storm water) into Newport Harbor.

17. During heavy rain, infiltration and inflow of rainwater and rising groundwater into the Newport System often overwhelms the System's capacity. This can, and does, impair the ability of the Newport WPCP to provide adequate treatment of the wastewater and storm water that passes through it. It also can, and does, cause wastewater and storm water to be discharged without first passing through the Newport WPCP. Such discharges, known as combined sewer overflows ("CSOs"), convey a mixture of storm water and wastewater into the surface waters with no or limited treatment.

18. Such infiltration and inflow causes CSO discharges from the Newport System to Newport Harbor through two designated CSO outfalls. In addition, such infiltration and inflow impairs the capacity of the Newport System to accept wastewater from the Town of Middletown, and thus contributes to the discharge of untreated wastewater to Easton's Moat, and thus to Easton's Bay, from Middletown's Wave Avenue Pump Station, which is located just across the border from Newport.

**B. Newport's Storm Water System**

19. In addition to the storm water drains that are connected to the City's sanitary sewer system, Newport's storm water system also includes of a variety of storm water outfalls which empty directly into Newport Harbor or Easton's Bay without treatment.

20. One of these storm water outfalls is located at the south end of Easton's Moat, a trench built around South Easton's Pond to collect storm water. Easton's Moat discharges to Easton's Bay near Easton's Beach (also called First Beach) and Atlantic Beach (also called Atlantic Beach Club Beach).

**C. Impact on Receiving Waters**

21. The waters off Newport are part of Narragansett Bay, which is an estuary. Estuaries are places where rivers meet the sea. Estuaries are critical to the health of coastal environments. In 1987 Congress created the National Estuary Program to improve the quality of estuaries of national significance. 33 U.S.C. § 1330. Narragansett Bay is in the National Estuary Program.

22. Newport Harbor and Easton's Bay are ecologically sensitive and iconic features of Rhode Island. They are important and heavily used resources, and have special aesthetic and recreational significance for the community and for tourists.

23. Sailing and other aquatic sports are popular in Newport Harbor. King Park, located in Newport Harbor adjacent to Newport's downtown tourist district, has historically provided a wide variety of recreational opportunities including swimming, fishing, boating, kayaking, and sailing.

24. Easton's Bay is home to Easton's Beach (First Beach) in Newport and Atlantic Beach (Atlantic Beach Club Beach) in Middletown. Together, these beaches offer a mile-long stretch of ocean beach adjacent to the famous cliff walk mansions of Newport.

25. Discharges of partially treated wastewater and contaminated storm water from the Newport System harm Newport Harbor and Easton's Bay and pose a risk to fisheries, wildlife habitat, and human heath. In addition to containing human waste and other sources of bacteria, CSOs from the Newport System can contain solvents, detergents, cleansers, inks, pesticides,

paints, pharmaceuticals, and other chemicals used by households and businesses and then discharged to the Newport System. Storm water discharged from the Newport System can contain bacteria from animal and/or human waste, as well as a variety of petroleum products and other chemicals. The failure of the Newport WPCP to consistently meet required treatment standards and discharge limits contributes additional bacteria and other pollutants to Newport Harbor.

26. The intensive public use of Newport Harbor and Easton's Bay and the adjacent beaches increases the likelihood that people will come into direct contact with the pollutants discharged by the Newport System.

27. The discharges from the Newport System to Newport Harbor and Easton's Bay are significant contributors to the frequent closing of swimming beaches and other recreational activity at King Park, Atlantic Beach, and Easton's Beach. The Rhode Island Department of Health posts the following warning about Easton's Beach and Atlantic Beach on its web site:

> The Department of Health discourages swimming, surfing and other full body contact activities at these beaches for a minimum of 24-hours after heavy rainfall. Heavy rains and discharges from storm water drains directly affect these waters. As a result, these waters may contain high levels of harmful bacteria that may cause illness after a heavy rain.

28. The discharges from the Newport System to Newport Harbor and Easton's Bay contribute to violations of water quality standards designed to protect public health and the environment.

## BACKGROUND ON THE CLEAN WATER ACT

29. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311 (a), prohibits the discharge of any pollutant into navigable waters of the United States from a "point source" unless the discharge is both: (a) covered by a National Pollutant Discharge Elimination System ("NPDES")

permit applicable to that point source, and (b) in compliance with the discharge limitations and other conditions set by such a permit. In Rhode Island, the NPDES program is known as the Rhode Island Pollutant Discharge Elimination System ("RIPDES") program, which is administered by RIDEM subject to the oversight and ultimate authority of EPA and pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342.

30. There are two types of NPDES permits: an individual permit and a general permit. An individual NPDES permit is issued for a particular discharge or set of discharges, and is applicable only to the owner and/or operator thereof. A general NPDES permit governs a category of similar discharges, and is applicable to all dischargers within that category that apply for and are granted coverage under its terms. Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p), establishes a framework under which general permits are often issued to regulate classes and categories of storm water discharges.

31. The Newport System is governed by two RIPDES permits: an individual permit governing the WPCP and combined sewer overflow facilities; and a general permit governing the storm sewer system.

32. Pursuant to section 505 of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen who has been affected by such violation may commence an enforcement action against any person who violates an "effluent standard or limitation" under the Clean Water Act. A violation of an "effluent standard or limitation" includes an unlawful act under Section 301(a) of the CWA, and any violation of an NPDES (or RIPDES) permit condition.

33. This "citizen suit" provision of the Clean Water Act grants jurisdiction to United States District Courts to hear such cases, to impose an injunction requiring compliance with the CWA and/or remediation of harm caused by violations of the Act, to impose any appropriate civil

penalties for violations of the CWA, and to award costs of litigation (including reasonable attorney and expert witness fees) to the substantially prevailing plaintiff.

## NEWPORT'S RIPDES PERMITS

### A. The Individual Permit

34. RIDEM has issued individual RIPDES Permit No. RI0100293 (the "Newport RIPDES Permit") to Newport and Earth Tech. The current version of this permit (the "2007 Permit") took effect on December 1, 2007. The previous version of this permit (the "1998 Permit") took effect on January 1, 1998. All of the provisions of the 2007 Permit cited in this Complaint were also in the 1998 Permit, albeit sometimes under different section numbering. All of the provisions of the Newport RIPDES Permit cited in this Complaint are identified by the section number used in the 2007 Permit.

35. The Newport RIPDES Permit authorizes Newport and Earth Tech to discharge wastewater to Newport Harbor through four permitted outfalls (discharge points): the Newport WPCP (Outfall 001A); the Wellington Avenue Combined Sewer Overflow Facility ("Wellington CSO Facility") (Outfall 007A); the Long Wharf Combined Sewer Overflow ("Long Wharf CSO") (Outfall 003A); and the Washington Street Combined Sewer Overflow Facility ("Washington CSO Facility") (Outfall 010A). Newport has posted on its web site a map identifying these facilities and their respective outfalls (except for the Long Wharf outfall), and a copy of this map is attached as Exhibit 2 to this Complaint. Compliance with certain permit requirements at the Long Wharf CSO and Washington CSO Facility is evaluated using the calculated effluent discharge designated as Outfall 002C ("Long Wharf/Washington Street Flow"). There has been no discharge from Outfall 003A, the Long Wharf outfall, for several years.

36. The Newport RIPDES Permit contains numeric and narrative limits on the discharge of pollutants, specifications for pollutant monitoring and reporting, and requirements governing the operation and maintenance of the Newport System.

37. Newport and Earth Tech are required by the Newport RIPDES permit to monitor effluent from the Newport WPCP, the Washington CSO Facility (included in the Long Wharf/Washington Street Flow), and the Wellington CSO Facility and submit the monitoring results to RIDEM monthly, on forms known as "discharge monitoring reports" ("DMRs"). DMRs are signed by the principal executive officer or authorized agent under the penalty of perjury. The Clean Water Act requires that DMRs be available to the public for inspection and copying.

38. DMRs submitted by Newport and/or Earth Tech that report violations of the Newport RIPDES permit are conclusive evidence of those violations.

39. The Newport RIPDES permit requires compliance with all conditions of the Rhode Island Department of Environmental Management Combined Sewer Overflow Policy ("RIDEM CSO Policy"), and the Environmental Protection Agency Combined Sewer Overflow Policy, ("EPA CSO Policy"), including those not specifically listed in the Newport RIPDES Permit.

40. In 1999 Newport and RIDEM entered into Consent Agreement No. RIA-292 ("1999 Consent Agreement") to resolve Newport's request for a hearing concerning certain requirements contained in the 1998 Permit.

41. The 1999 Consent Agreement is not a RIPDES permit. It was not issued in accordance with applicable requirements for issuing a RIPDES permit. Among other things, there was no opportunity for public notice and comment or for review by EPA prior to entry of the Consent Agreement.

42. Pursuant to the Consent Agreement, RIDEM agreed to refrain from enforcing the effluent limits at the Wellington CSO Facility and Washington CSO Facility until Newport completes the design and construction of CSO abatement alternatives. Although the 1999 Consent Agreement established a procedure for Newport to follow to design and construct CSO abatement alternatives, the Consent Agreement did not set any deadline for compliance with applicable Clean Water Act requirements.

**B. The General Storm Water Permit**

43. Newport is authorized to discharge storm water in accordance with the Rhode Island General Permit for Storm Water Discharge from Small Municipal Separate Storm Sewer Systems, RIPDES No. RIR040000 (the "General Permit").

44. The General Permit contains a number of requirements governing the discharge of storm water in situations in which such discharge poses a threat to water quality, human health, aquatic life, and/or wildlife.

**<u>COUNT I</u>**

**Violation of Effluent Limitations in the Newport RIPDES Permit Governing the Newport WPCP**

45. The Newport RIPDES Permit, ¶ 1.A.1-2, imposes effluent limitations on biochemical oxygen demand ("BOD"), BOD % removal, total suspended solids ("TSS"), TSS % removal, total residual chlorine, fecal coliform bacteria, and flow (discharge volume) at Outfall 001A, the Newport WPCP.

46. BOD is a measure of the oxygen-consuming capacity of organic matter in wastewater. High levels of BOD can reduce the dissolved oxygen content of the water body into which wastewater is discharged. Low dissolved oxygen levels in a water body can cause damage to fish and other aquatic species by, *inter alia,* disrupting their feeding patterns, reproductive habits,

and migration patterns. Sufficiently low dissolved oxygen levels can be lethal to many aquatic species.

47. TSS is a measure of solid matter suspended in wastewater. High levels of TSS in wastewater can be an indication of high levels of organic matter, which will then biodegrade and consume oxygen in the water body into which the wastewater is discharged. High levels of TSS can harm fish by blocking their gills and inhibiting growth and reproduction. Increased TSS can also reduce light penetration into the water body into which wastewater is discharged, potentially slowing plant growth by inhibiting photosynthesis and leading to reduced food for aquatic life and reduced levels of dissolved oxygen. Accumulation of suspended particles in the water body can alter spawning grounds and feeding habitats of fish and other aquatic species.

48. Because BOD and TSS are related to the presence of solids in the wastewater, discharges in excess of each of these parameters often are linked to the same deficiencies in wastewater treatment.

49. The Newport RIPDES Permit limits the concentration of BOD and TSS in the wastewater (a) in any one day (a "daily maximum" limit), (b) as a per day average over the course of each week (a "weekly average" limit), and (c) as a per day average over the course of each month (a "monthly average" limit). The permit also contains a daily maximum and monthly average limit on the total number of pounds of BOD and TSS discharged. The Newport RIPDES Permit also requires, as a minimum monthly average, 85% percent removal of BOD and TSS prior to discharge. These BOD and TSS limits in the Newport RIPDES Permit are mandated by national regulations set by EPA for all municipal treatment plants.

50. DMRs and Monthly Operating Reports for the Newport System prepared by Earth Tech establish that during the five years preceding the Notice Letter, Newport and Earth Tech often

failed to achieve the daily maximum pounds, daily maximum concentration, weekly average concentration, and minimum monthly average percent removal limits for BOD and TSS. Exhibit 3, attached hereto, lists instances in which Newport and Earth Tech failed to achieve these limits. Each time Newport and Earth Tech fail to achieve these limits, they violate the Clean Water Act.

51. Under the Clean Water Act, the violation of a monthly average limit constitutes 30 days of violation, and the violation of a weekly average limits constitutes seven days of violation.

52. Chlorine is added to the wastewater at the Newport WPCP as a disinfectant (to kill bacteria). Total residual chlorine ("TRC") is the amount of chlorine remaining in the wastewater upon discharge. Chlorine causes environmental harm at low levels. Chlorine is especially harmful to organisms living in water and in soil.

53. The Newport RIPDES Permit contains daily maximum and monthly average limits on the concentration of TRC in the wastewater.

54. DMRs and Monthly Operating Reports for the Newport System prepared by Earth Tech establish that during the five years preceding the Notice Letter, Newport and Earth Tech have often exceeded the daily maximum concentration limits for TRC. Exhibit 3, attached hereto, lists instances in which Newport and Earth Tech failed to achieve this limit. Each time Newport and Earth Tech exceed this limit, they violate the Clean Water Act.

55. Fecal coliform bacteria are prevalent in the intestines of warm-blooded animals, including humans. The presence of fecal coliform in water is an indication that fecal contamination may have occurred and that pathogens (disease-carrying agents) may be present.

56. In monitoring its wastewater for fecal coliform under the Newport RIPDES Permit, Newport and Earth Tech are required to calculate the "most probable number" ("MPN") of fecal coliform colonies in a sample of the wastewater. The Newport RIPDES Permit imposes monthly

average, weekly average, and daily maximum limits on the discharge of fecal coliform from the Newport WPCP.

57. DMRs and Monthly Operating Reports for the Newport System prepared by Earth Tech establish that during the five years preceding the Notice Letter, Newport and Earth Tech have often exceeded the monthly average, weekly average, and daily maximum fecal coliform limits. Exhibit 3, attached hereto, lists instances in which Newport and Earth Tech failed to achieve these limits. Each time Newport and Earth Tech exceed these limits, they violate the Clean Water Act.

58. The Newport RIPDES Permit contains daily maximum and monthly average limits, expressed in millions of gallons per day, on the volume of wastewater that may be discharged by the Newport WPCP in any given day.

59. DMRs and Monthly Operating Reports for the Newport System prepared by Earth Tech establish that during the five years preceding the Notice Letter, Newport and Earth Tech have often exceeded the monthly average and daily maximum flow limits. Exhibit 3, attached hereto, lists instances in which Newport and Earth Tech failed to achieve these limits. Each time Newport and Earth Tech exceed these limits, they violate the Clean Water Act.

60. Newport and Earth Tech have not made changes to the operation and/or technology of the Newport WPCP sufficient to ensure against future effluent violations at Outfall 001. Without sufficient additional measures to control the operation of the WPCP, the facility will continue to be particularly susceptible to such violations during periods of heavy rain and resultant increased flow to the WPCP. This susceptibility will increase if Newport and Earth Tech take steps to reduce the incidence and severity of CSO discharges in the Newport System. This susceptibility will also increase if the Town of Middletown takes steps to reduce the incidence and severity of

its sanitary sewer overflows and thus to direct a larger flow to the Newport WPCP. Accordingly, Newport and Earth Tech will continue to violate effluent limits at the Newport WPCP after the date this Complaint is filed.

## COUNT II

### Failure to Meet the Monitoring and Percentage Removal Requirements in the Newport RIPDES Permit Governing the Wellington CSO Facility

61. Paragraphs 1 through 60 are realleged and incorporated by reference herein.

62. The Newport RIPDES Permit, ¶ I.A.8, imposes specific minimum percentage removal requirements for BOD and TSS at Outfall 007A, the discharge from the Wellington CSO Facility. Under these requirements, a minimum of 35% of the BOD and 50% of the TSS in the wastewater entering the Wellington CSO Facility must be removed prior to the discharge of that wastewater through Outfall 007A.

63. The Newport RIPDES Permit, ¶ I.B.1.a, also requires compliance with all conditions of the RIDEM CSO Policy. The RIDEM CSO Policy requires that each CSO discharge receive "equivalent primary treatment," which is defined as the use of technologies "such that the treated effluent results in removal rates of 50% of the [TSS] and 35% of the [BOD] loadings or 100% of all settleable solids, whichever is demonstrated to have the greatest water quality impact."

64. The Newport RIPDES Permit, ¶¶ I.A.8, I.A.9, and I.B.1.b.9, also requires Newport and Earth Tech to monitor the wastewater at the Wellington CSO Facility twice monthly during CSOs that last for 15 minutes or longer and to report the results to DEM. Such effluent monitoring and reporting is to be done for BOD, BOD percentage removal, TSS, TSS percentage removal, fecal coliform, total residual chlorine, oil and grease, settleable solids, and settleable solids percentage removal.

65. Beginning in March 2004, Newport and Earth Tech have not performed regular monitoring and reporting with regard to BOD, BOD percentage removal, TSS, TSS percentage removal, oil and grease, settleable solids, and settleable solids percentage removal at the Wellington CSO Facility. Exhibit 4, attached hereto, lists the dates of CSOs of 15 minutes or longer at the Wellington CSO Facility for which the required monitoring and reporting for these parameters were not performed. Each time that Newport and Earth Tech fail to perform such monitoring and reporting they violate the Clean Water Act.

66. DMRs for the Newport System, and the raw data used to prepare the DMRs, establish that during the time that they did perform such monitoring and reporting at the Wellington CSO Facility over the five years preceding the Notice Letter, Newport and Earth Tech regularly failed to attain the minimum percentage removal requirements for BOD and TSS described above, and also failed to attain 100% removal of settleable solids. Exhibit 5, attached hereto, lists instances of such violations reflected in the monitoring data generated over this period.

67. Since their cessation of regular monitoring and reporting at the Wellington Facility in March 2004, Newport and Earth Tech have not made changes to the operation and/or technology of the Wellington CSO Facility sufficient to meet these removal requirements. Accordingly, each time a CSO occurs at the Wellington CSO Facility, including each of the dates listed in Exhibit 4, Newport and Earth Tech violate the Clean Water Act by failing to attain the required removal efficiencies. Such violations will continue at the Wellington CSO Facility after the date this Complaint is filed.

## COUNT III

### Failure to Meet the Percentage Removal Requirements in the Newport RIPDES Permit for the Long Wharf/Washington Street Flow

68. Paragraphs 1 through 67 are realleged and incorporated by reference herein.

69. The Newport RIPDES Permit specifies a hypothetical Outfall 002C to evaluate the effluent quality of the discharges from the Long Wharf CSO and the Washington CSO Facility. The permit specifies that removal efficiencies (% BOD removal, % TSS removal, and % settleable solids removal) for this hypothetical outfall are to be calculated, according to a specified formula, with reference to data on: (a) wastewater entering the Washington CSO Facility; (2) wastewater discharged from the Washington CSO Facility; (3) wastewater pumped from the Washington CSO Facility to the Newport WPCP; (4) wastewater discharged from the Newport WPCP; and (5) wastewater discharged from the Long Wharf CSO. When, as has been the case for several years, no wastewater is discharged from the Long Wharf CSO, the removal efficiencies for the Long Wharf/Washington Street Flow are calculated with reference to the first four of these wastewater flows.

70. The Newport RIPDES Permit, ¶ I.A.8, imposes specific minimum percentage removal requirements for BOD and TSS that must be attained for the Long Wharf/Washington Street Flow. Under these requirements, a minimum of 35% of the BOD and 50% of the TSS in the wastewater must be removed prior to discharge.

71. DMRs for the Newport System establish that during the five years preceding the Notice Letter, Newport and Earth Tech have regularly failed to meet these percentage removal requirements for the Long Wharf/Washington Street Flow. Exhibit 6, attached hereto, lists instances in which Newport and Earth Tech failed to achieve these limits. Each time Newport and Earth Tech fail to achieve these required removal efficiencies, they violate the Clean Water Act.

72. Newport and Earth Tech have not made changes to the operation and/or technology of the Washington CSO Facility and/or the Newport WPCP sufficient to meet these removal requirements. Accordingly, such violations will continue after the date this Complaint is filed.

## COUNT IV

### Failure to Meet the Percentage Removal Requirements in the Newport RIPDES Permit for the Washington CSO Facility

73. Paragraphs 1 through 72 are realleged and incorporated by reference herein.

74. The Newport RIPDES Permit, ¶ I.B.1.a, requires compliance with all conditions of the RIDEM CSO Policy. The RIDEM CSO Policy requires that each CSO discharge receive "equivalent primary treatment," which is defined as the use of technologies "such that the treated effluent results in removal rates of 50% of the [TSS] and 35% of the [BOD] loadings or 100% of all settleable solids, whichever is demonstrated to have the greatest water quality impact."

75. DMRs for the Newport System establish that during the five years preceding the Notice Letter, Newport and Earth Tech have regularly failed to meet this primary treatment requirement at Outfall 010A, the discharge from the Washington CSO Facility.

76. Exhibit 6, attached hereto, lists instances on which one or more of the calculated percentage removal rates for the Long Wharf/Washington Street Flow fell below the specified primary treatment removal rate. Because these calculated removal rates are based on a combination of the removal rates attained at the Washington CSO Facility and the (generally much higher) removal rates attained at the Newport WPCP, each such instance listed in Exhibit 6 also represents a failure to meet the primary treatment requirement at the Washington CSO Facility.

77. Each time Newport and Earth Tech fail to meet this primary treatment requirement at the Washington CSO Facility, they violate the Clean Water Act.

78. Newport and Earth Tech have not made changes to the operation and/or technology of the Washington CSO Facility sufficient to meet this primary treatment requirement. Accordingly, such violations will continue at the Washington CSO Facility after the date this Complaint is filed.

## COUNT V

### Failure to Reduce the Magnitude and Frequency of CSOs as Required by the Newport RIPDES Permit

79. Paragraphs 1 through 78 are realleged and incorporated by reference herein.

80. The Newport RIPDES Permit, ¶ I.B.1.b.i, requires Newport and Earth Tech to "maintain and implement Standard Operating Procedures and proper operation and maintenance programs for the sewer system and all CSO outfalls to reduce the magnitude, frequency, and duration of CSOs."

81. Between January 2006 and December 2007, the number gallons of wastewater discharged by Newport per inch of rain has increased.

82. During the five years preceding the Notice Letter, Newport and Earth Tech have failed to reduce the magnitude or frequency of CSOs.

83. The Plaintiffs are unaware of any change in the operation and maintenance of the Newport System that will reduce the magnitude or frequency of these CSO discharges. Upon information and belief, Newport and Earth Tech will continue to violate this requirement after the date this Complaint is filed.

## COUNT VI

### Failure to Operate the WPCP at Maximum Treatable Flow During Wet Weather as Required by the Newport RIPDES Permit

84. Paragraphs 1 through 83 are realleged and incorporated by reference herein.

85. The Newport RIPDES Permit, ¶ I.B.1.b.4, requires Newport and Earth Tech to "maintain and implement Standard Operating Procedures to operate the POTW treatment plant at maximum treatable flow during all wet weather conditions to reduce the magnitude, duration, and frequency of CSOs."

86. Newport and Earth Tech have not consistently operated the Newport WPCP at maximum treatable flow during wet weather conditions.

87. Flows of wastewater to the Newport WPCP over 19.7 million gallons per day, the design capacity of the WPCP, have routinely resulted in violations of a number of the Newport RIPDES Permit requirements governing the discharge from the WPCP.

88. Although Newport and Earth Tech drafted and submitted to RIDEM a flow optimization study in April 2007, they have not implemented Standard Operating Procedures to maximize treatable flow to the Newport WPCP during wet weather. The flow optimization study recommends increasing the treatment capacity of the Newport WPCP, with a goal of reducing the magnitude, frequency, and duration of CSOs without contributing to violations of the permitted limits for the Newport WPCP.

89. The Plaintiffs are unaware of any change in the operation and maintenance of the Newport System that will result in the maximization of treatable flow to the Newport WPCP during wet weather. Upon information and belief, Newport and Earth Tech will continue to violate this requirement after this Complaint is filed.

## COUNT VII

### Failure to Operate and Improve the Sewer System to Minimize the Discharge of Pollutants from CSOs as Required by the Newport RIPDES Permit

90. Paragraphs 1 through 89 are realleged and incorporated by reference herein.

91. The Newport RIPDES Permit, ¶ I.E.2, requires Newport and Earth Tech to "operate and improve the sewer system to minimize the discharge of pollutants" from the CSOs.

92. Newport and Earth Tech have failed to minimize the discharge of pollutants from the Wellington CSO Facility. The microstrainers at the Wellington CSO Facility have long been inoperable, and have never worked properly. The upgrades made to this facility in 2001 and 2003 were not sufficient to minimize the discharge of BOD, TSS, and other pollutants.

93. The Wellington CSO facility does not have an adequate chlorination system, and Newport and Earth Tech do not minimize the discharge of fecal coliform. The fecal coliform levels in the Wellington CSO Facility's effluent routinely exceed 200,000 MPN/100ml.

94. Newport and Earth Tech's violation of this provision of the Newport RIPDES Permit is ongoing and will continue after the filing of this Complaint.

## COUNT VIII

### Failure to Timely Develop and Submit a Long-Term CSO Control Plan as Required by the Newport RIPDES Permit

95. Paragraphs 1 through 94 are realleged and incorporated by reference herein.

96. Since the time it was revised and reissued in November 1997, the Newport RIPDES Permit has required compliance with all conditions of the EPA CSO Policy, including those not specifically listed in the permit. This requirement was found at ¶ 1.B.2 of the 1998 Permit, and is found at ¶ I.B.1.a of the 2007 Permit. The EPA CSO Policy was issued in 1994, and is found at 59 Fed. Reg. 18,688 (April 19, 1994).

97. The EPA CSO Policy, ¶¶ II.A and IV.B.c, requires permittees covered by the policy to "immediately undertake ... to develop a long-term CSO control plan," and to develop such plan "as soon as practicable but generally within two years" of permit issuance. This requirement has

been applicable to Newport since the effective date of the 1998 Permit, and has been applicable to Earth Tech since it became the operator of the Newport System in 2000.

98. Newport and Earth Tech have not developed a long-term CSO control plan.

99. Although Newport and Earth Tech have taken steps to develop a long-term CSO control plan, the plan currently under development would address only the Wellington CSO Facility, and not the Washington CSO Facility.

100. To be adequate, a long-term CSO control plan for the Newport System would, at a minimum, need to address both the Wellington CSO Facility and the Washington CSO Facility.

## COUNT IX

### Failure to Minimize Infiltration and Inflow to the Sewer System as Required by the Newport RIPDES Permit

101. Paragraphs 1 through 100 are realleged and incorporated by reference herein.

102. The Newport RIPDES Permit, ¶ I.E.2, requires Newport and Earth Tech to "operate and improve the sewer system to minimize infiltration/inflow into the sewer system." Newport and Earth Tech have not met and are not meeting this requirement.

103. Between January 2006 and December 2007, the amount of infiltration and inflow, measured in gallons of wastewater discharged by Newport per inch of rain, has increased.

104. There are a number of cross-connections in the Newport System between the storm sewer and sanitary sewer. During rain events, storm water and groundwater enter the sanitary sewer at the cross-connection points. Newport and Earth Tech estimate that 28 cross connections and catch basins can contribute two million gallons of wastewater per day to the sanitary sewer during peak flow.

105. In addition, Newport and Earth Tech estimate that rain leaders and sump pumps can contribute more than one and one-half million gallons of water per day to the sanitary sewer during peak flow.

106. There are a variety of steps that could be taken to reduce or eliminate the number of cross-connections in the Newport System and/or to reduce or eliminate the connections to roof drains and sump pumps. The measures taken by Newport and Earth Tech have not resulted in a significant decrease in the infiltration and inflow into the sewer system.

## COUNT X

### Failure to Minimize and Prevent Discharges Likely to Adversely Affect Human Health or the Environment as Required by the Newport RIPDES Permit

107. Paragraphs 1 through 106 are realleged and incorporated by reference herein.

108. The Newport RIPDES Permit, General Condition (d), requires Newport and Earth Tech to "take all reasonable steps" to "minimize or prevent" any discharge that "has a reasonable likelihood of adversely affecting human health or the environment." Newport and Earth Tech are not meeting this requirement.

109. The Washington and Wellington CSO Facilities regularly discharge wastewater with fecal coliform levels above 200,000 MPN/100ml.

110. The Washington CSO and Wellington CSO Facilities regularly discharge wastewater with high concentrations of BOD and TSS.

111. Due (in whole or in part) to Newport's CSO discharges, beaches in or near Newport Harbor have been closed, and restrictions have been placed on shellfishing, to address human health concerns.

112. Exposure to viruses, bacteria, pathogens, and other CSO-related pollutants can adversely affect public health. Swimmers, boaters, and others exposed to CSO contaminants are

vulnerable to gastroenteritis, respiratory infections, eye or ear infections, skin rashes, hepatitis, and other diseases. Children, the elderly, and people with suppressed immune systems are especially vulnerable to these pollutants.

113. Wildlife and aquatic habitat are also adversely affected by CSOs, which can lead, *inter alia*, to higher water temperatures, increased turbidity, increased concentrations of toxicants, and reduced oxygen levels in the water.

114. Newport and Earth Tech have not pursued available short-term and long-term approaches that would minimize CSOs at the Newport System and thus reduce the corresponding negative human and environmental health effects that emanate from CSO discharges.

115. Newport and Earth Tech do not provide treatment of the Newport CSO discharges sufficient to minimize the negative human and environmental health effects of such discharges.

## COUNT XI

### Violation of Narrative Water Quality Standards in Violation of the Newport RIPDES Permit

116. Paragraphs 1 through 115 are realleged and incorporated by reference herein.

117. The Newport RIPDES Permit, ¶ I.B.1.a, requires compliance with all conditions of the EPA CSO Policy, including those not specifically listed in the permit. The EPA CSO Policy, ¶ IV.B.1.c, requires compliance "with applicable WQS [water quality standards], no later than the date allowed under the State's WQS, expressed in the form of a narrative requirement."

118. Because the Wellington and Washington CSO Facilities discharge inadequately treated sewage and other pollutants, cause or contribute to the closure and restriction of public beaches for swimming and other recreational uses, and cause or contribute to the closure of shellfish beds, the discharges from these facilities violate the minimum general water quality criteria set forth in Part D.(1)(a)(i)-(v) and Part D.(1)(b)(i)-(iii) of Rule 8 of the Rhode Island and

Providence Plantations Department of Environmental Management Water Quality Regulations (July 2006) ("RI WQ Regulations"), and will continue to do so until appropriate corrective action is taken.

119. In violation of these criteria, these discharges: "[a]dversely affect the physical, chemical, or biological integrity of the habitat;" "[a]dversely affect human health;" "[s]ettle to form deposits that…create a nuisance [] or interfere with the existing or designated uses;" create floating materials that "create a nuisance or interfere with the existing or designated uses;" and "[p]roduce odor or taste or change the…biological conditions to such a degree as to create a nuisance or interfere with the existing or designated uses."

## COUNT XII

### Failure to Determine the Nature and Duration of Harmful Conditions Due to CSO Events as Required by the Newport RIPDES Permit

120. Paragraphs 1 through 119 are realleged and incorporated by reference herein.

121. The Newport RIPDES Permit, ¶ I.B.1.b.8, requires Newport and Earth Tech to implement a public notification process to inform citizens of when and where CSOs occur. This process must include a system to determine the nature and duration of conditions that are potentially harmful for users of receiving waters due to CSOs.

122. Newport and Earth Tech have not taken steps to ascertain the public health risk associated with participating in water-based activities on or in Newport Harbor after a CSO event.

123. Between July 2004 and December 2007, Newport, Earth Tech, and the Rhode Island Department of Health did not conduct any water quality monitoring of Newport Harbor. Clean Ocean Access began conducting water quality monitoring at Elm Street Pier and King Park in January 2008, but such monitoring does not always coincide with CSO events. Newport and

Earth Tech do not perform water quality monitoring of Newport Harbor after a CSO event to determine the duration of harmful conditions.

124. Newport and Earth Tech do not provide the public with real-time data and information about the safety of using Newport Harbor for water-contact recreation after CSO discharges.

## COUNT XIII

### Failure to Characterize CSO Impacts and the Efficacy of CSO Controls as Required by the Newport RIPDES Permit

125. Paragraphs 1 through 124 are realleged and incorporated by reference herein.

126. The Newport RIPDES Permit, ¶ I.B.1.b.9, requires Newport and Earth Tech to monitor CSO outfalls to characterize CSO impacts and the efficacy of CSO controls. This requires the periodic collection of data, including water quality data for the receiving water bodies and data demonstrating water quality impacts directly related to CSOs.

127. Newport and Earth Tech do not conduct routine or periodic water quality monitoring of Newport Harbor.

128. Newport and Earth Tech lack the information necessary to characterize the water quality impacts directly related to the Newport CSOs. Without water quality data for the receiving water, Newport and Earth Tech cannot characterize CSO impacts and the efficacy of CSO controls.

129. In March 1994, Metcalf and Eddy and the University of Rhode Island Department of Civil Engineering prepared a "Report on the Marine CSO Monitoring Program." This study focused on the water quality impacts related to the construction of the Washington CSO Facility, but did not examine the water quality impacts of the CSO discharges themselves. No water quality studies have been conducted since then to determine the water quality impacts related to the Washington CSO Facility.

130. Although Newport conducted an assessment of the Washington Street and Wellington CSO Facilities in 1999, no water quality studies were conducted during that assessment specifically to evaluate the impacts of the CSO discharges on the Newport Harbor receiving waters.

131. Since at least 1994 Newport and Earth Tech have not conducted or commissioned water quality studies to determine the water quality impacts of the discharges from either the Wellington CSO Facility or the Washington CSO Facility.

## COUNT XIV

### Discharges of Storm Water Mixed with Non-Storm Water in Violation of the General Storm Water Permit

132. Paragraphs 1 through 131 are realleged and incorporated by reference herein.

133. The General Permit, ¶I.B.4.a, prohibits "storm water discharges mixed with non-storm water discharges" that are not specifically authorized under the General Permit. The General Permit, ¶ I.B.4.b, also prohibits otherwise allowable non-storm water discharges "which are determined to be significant contributors of pollutants to waters of the State." Violations of these prohibitions are ongoing at the Newport System.

134. The storm water discharges from the Newport System to Easton's Bay are, and have been determined to be, significant contributors of pollutants that bring about frequent restrictions on swimming and other recreational activities at Easton's Beach and Atlantic Beach.

135. To the extent that the storm water discharges from the Newport System to Easton's Beach and Atlantic Beach contain fecal coliform bacteria, enterococci, *E Coli*, or other bacteria, pathogens, or other pollutants with non-storm water origin, these are discharges of storm water mixed with non-storm water in violation of the General Permit.

136. Such violations occur, for example, when the Town of Middletown discharges sanitary sewer overflows ("SSOs") to Easton's Pond Moat. These SSO discharges mix with the storm water collected by Newport in Easton's Pond Moat, and are discharged by Newport to Easton's Bay.

137. Such violations also occur when animals deposit fecal wastes into Easton's Pond Moat. These wastes mix with the storm water collected by Newport in Easton's Pond Moat, and are discharged by Newport to Easton's Bay.

## COUNT XV

### Violations of the Rhode Island Anti-Degradation Policy in Violation of the General Permit

138. Paragraphs 1 through 137 are realleged and incorporated by reference herein.

139. The General Permit, ¶ I.B.4.k, prohibits "discharges not in compliance with the state's anti-degradation policy for water quality standards." Rule 18.B. of the Rhode Island Water Quality Regulations, which is part of the state's anti-degradation policy and applies to discharges that began or were expanded after November 28, 1975, prohibits degradation of a water body that interferes with an existing use. Storm water discharges to Easton's Bay from the Newport System are in ongoing violation of this provision.

140. The storm water discharge from Easton's Pond Moat is a new or expanded discharge within the meaning of Rule 18.B. of the Rhode Island Water Quality Regulations.

141. The discharges from the Newport storm water system to Easton's Bay are significant contributors to the frequent restrictions on swimming and other recreational activities at Easton's Beach and Atlantic Beach, and thus interfere with those uses in violation of the anti-degradation policy.

**AS TO COUNTS I THROUGH XV, INCLUSIVE, PLAINTIFFS AND MEMBERS OF ENVIRONMENT RHODE ISLAND ARE HARMED BY NEWPORT AND EARTH TECH'S CLEAN WATER ACT VIOLATIONS**

142. Plaintiffs Burton Hoffman, Henry Rosemont Jr., David Wixted, and Henry T. Wrobel and members of Plaintiff Environment Rhode Island consider Defendants' illegal pollution to be a blight on Newport. Life in Newport revolves around the water, and they believe there should be no illegal pollution of the waters off the City's coastline.

143. Plaintiffs Hoffman, Rosemont, Wixted, and Wrobel and members of Environment Rhode Island use and enjoy the coastline and waters in and around Newport, including but not limited to Easton's Beach, Atlantic Beach, King Park, Newport Harbor, and Easton's Bay, for recreational, aesthetic, educational, and conservation, purposes. They sail, swim, picnic, fish, hike, and enjoy the wildlife in and around Newport Harbor and Easton's Bay, but they curtail these activities because of, and their enjoyment of them is diminished by, Defendants' ongoing combined sewer overflows, discharges of inadequately treated wastewater, discharges of contaminated storm water, and other violations of the Clean Water Act described above. By way of limited example only:

a. Mr. Hoffman would like to swim in the water at King Park but does not because of the pollution from the Newport System. Mr. Hoffman has moored his sailboat in Newport Harbor, but the sailing experience in the Harbor is marred by the Defendants' illegal pollution.

b. Mr. Rosemont enjoys taking his grandchildren to the Harbor at the bottom of Washington Street, but does not allow them to play in the water because he fears the pollution from the Newport System would make them sick. Mr. Rosemont does not take his grandchildren

swimming at Easton's Beach if it has recently rained because of the storm water discharges and sewer overflows that pollute Easton's Bay.

c. Mr. Wixted has lived in Newport for twelve years and would like to swim in Newport Harbor at King Park or Ft. Adams, or at Easton's Beach, but does not because of the pollution from the Newport System.

d. Mr. Wrobel moors his sailboat in Newport Harbor. He would like to be able to swim from this boat, but worries about disease and infections from the bacteria added to the water from the Newport System.

**RELIEF REQUESTED AS TO COUNTS I THROUGH XV, INCLUSIVE**

Plaintiffs request that this Court grant the following relief:

1. Declare Newport and Earth Tech to have violated and to be in continuing violation of the Clean Water Act;

2. Issue an injunction ordering Newport and Earth Tech to stop operating the Newport WPCP, Washington CSO Facility, and Wellington CSO Facility in violation of the Clean Water Act;

3. Issue an injunction ordering Newport and Earth Tech to stop operating the storm sewer system in violation of the Clean Water Act;

4. Issue an injunction ordering Newport and Earth Tech to remediate the effects of past violations of the Clean Water Act;

5. Order Earth Tech to pay civil penalties for each violation of the Clean Water Act occurring on or after March 12, 2003, in an appropriate amount as provided by 33 U.S.C. §§ 1319(d) and 1365(a);

6. Order Newport and Earth Tech to pay reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d); and

7. Provide such other and further relief as may be just and proper.

Dated: July 16, 2008

Karen Pelczarski, #3357
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903
(401) 831-8900 (phone)
(401) 751-7542 (fax)

Theresa Labriola
(*pro hac vice* application to be filed)
Charles C. Caldart
(*pro hac vice* application to be filed)
National Environmental Law Center
44 Winter Street, 4th Floor
Boston, Massachusetts 02108
(617) 747-4301 (phone)
(617) 292-8057 (fax)

David A. Nicholas
(*pro hac vice* application to be filed)
20 Whitney Road
Newton, Massachusetts 02460
(617) 964-1548 (phone)
(617) 663-6233 (fax)

Counsel for Plaintiffs
Environment Rhode Island
Burton Hoffman
Henry Rosemont, Jr.
David Wixted
Henry T. Wrobel