UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ENVIRONMENT RHODE ISLAND, ET AL., Plaintiff, | |
| UNITED STATES OF AMERICA, Plaintiff- Intervenor, | |
| STATE OF RHODE ISLAND, Plaintiff-Intervenor, | CIVIL ACTION NO. 08-265S |
| v. | |
| CITY OF NEWPORT, RHODE ISLAND, Defendant. | |

# CONSENT DECREE

TABLE OF CONTENTS

I. STATEMENT OF CLAIM .......... 3
II. JURISDICTION AND VENUE .......... 3
III. APPLICABILITY .......... 4
IV. DEFINITIONS .......... 5
V. OBJECTIVES .......... 10
VI. CIVIL PENALTY .......... 11
VII. REMEDIAL MEASURES .......... 13
VIII. STORMWATER FROM EASTON'S POND MOAT .......... 42
IX. REPORTS ON COMPLIANCE .......... 46
X. APPROVAL OF SUBMISSIONS .......... 49
XI. STIPULATED PENALTIES .......... 51
XII. FORCE MAJEURE .......... 55
XIII. DISPUTE RESOLUTION .......... 59
XIV. RIGHT OF ENTRY/INFORMATION COLLECTION AND RETENTION .......... 62
XV. FORM OF NOTICE .......... 64
XVI. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS .......... 67
XVII. COSTS .......... 70
XVIII. EFFECTIVE DATE .......... 70
XIX. RETENTION OF JURISDICTION .......... 71
XX. MODIFICATION .......... 71
XXI. FUNDING .......... 71
XXII. SEVERABILITY .......... 72
XXIII. TERMINATION .......... 72
XXIV. FINAL JUDGMENT .......... 73
XXV. WAIVER OF SERVICE .......... 73
XXVI. PUBLIC COMMENT .......... 73
XXVII. SIGNATORIES .......... 74
XXVIII. INTEGRATION .......... 74
ATTACHMENT NO. 1
ATTACHMENT NO. 2
ATTACHMENT NO. 3
ATTACHMENT NO. 4

WHEREAS, Plaintiffs Environment Rhode Island, Burton Hoffman, Henry Rosemont, Jr., David Wixted, and Henry T. Wrobel (collectively "Citizen Plaintiffs"), filed an action under the citizen suit provisions of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq*., alleging that the City of Newport, Rhode Island ("City," "Newport," or "Defendant") and Earth Tech, Inc. violated Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), by discharging pollutants into waters of the United States from its Water Pollution Control Plant ("WPCP") and wastewater collection system ("Collection System") in violation of the National Pollutant Discharge Elimination System ("NPDES") Permit No. RI0100293, issued to Newport by the Rhode Island Department of Environmental Management and known as a Rhode Island Pollutant Discharge Elimination System Permit ("Newport RIPDES Permit"), and by discharging storm water in violation of RIPDES No. RIR040000, the Rhode Island General Permit for Storm Water Discharge from Small Municipal Separate Storm Sewer Systems ("General Storm Water Permit");

WHEREAS, Section 309(e) of the CWA, 33 U.S.C. § 1319(e), requires that, whenever the United States brings a civil enforcement action against a municipality under Section 309, the state in which the municipality is located shall be joined as a party;

WHEREAS, Plaintiff, the United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), and the Rhode Island Department of Environmental Management ("RIDEM") on behalf of Rhode Island ("Rhode Island" or the "State") (collectively, "Government Plaintiffs") filed a Motion to Intervene in the citizen suit to protect the interests of the United States and Rhode Island in the uniform and effective

application of federal and state environmental laws, and that Motion was granted by the Court and the United States and Rhode Island filed their Complaint against the Defendant;

WHEREAS, the United States' and Rhode Island's Complaint alleges that the Defendant violated and continues to violate Section 301(a) of the CWA, and the Rhode Island Water Pollution Control Act, R.I.G.L. §§ 46-12, *et seq.* ("Rhode Island Act"), by discharging pollutants into waters of the United States from its WPCP and wastewater collection system ("Collection System") in violation of the Newport RIPDES Permit, and by discharging pollutants into waters of the United States without authorization under any RIPDES permit or any other provision of the CWA;

WHEREAS, Citizen Plaintiffs resolved the civil claims alleged in their Complaint against Earth Tech, Inc. (now known as AECOM Technical Services, Inc.) and the Court dismissed Citizen Plaintiffs' claims against Earth Tech, Inc. on April 15, 2010. (Docket No. 27);

WHEREAS, entry of this Consent Decree by the Court will resolve the civil claims alleged in the Complaint of the United States and Rhode Island, and the Complaint of Citizen Plaintiffs (collectively, "Complaints") against Defendant Newport through the date of lodging of this Consent Decree;

WHEREAS, the City takes the position that it has been working diligently during the course of this litigation and well prior thereto by working cooperatively with the RIDEM to improve the City's system to fully comply with the EPA CSO Policy (59 Fed. Reg. 18,688 (April 19, 1994)) and CWA;

WHEREAS, the Citizen Plaintiffs take the position that the City has been recalcitrant in

meeting its obligations under the CWA; and

WHEREAS, the United States, Rhode Island, Citizen Plaintiffs, and the Defendant (collectively, the "Parties") recognize, without admission of facts or law except as expressly stated herein, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith, that settlement of this matter is fair, reasonable, and in the public interest, and that entry of this Consent Decree without further litigation is an appropriate resolution of this action;

NOW, THEREFORE, with the consent of the Parties, it is hereby ordered, adjudged, and decreed as follows:

## I. STATEMENT OF CLAIM

1. The Complaints state claims upon which relief can be granted against the Defendant pursuant to Section 505 of the CWA, 33 U.S.C. § 1365 (for the Citizen Plaintiffs), and Section 309 of the CWA, 33 U.S.C. § 1319 (for the Government Plaintiffs). The Government Plaintiffs' Complaint also states claims upon which relief can be granted pursuant to the Rhode Island Act, R.I.G.L. § 46-12-3.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of the Citizen Plaintiffs' action pursuant to Section 505(a) of the CWA, 33 U.S.C. 1365(a) and 28 U.S.C. § 1331, and over the subject matter of the Government Plaintiffs' action pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331, 1345, 1355, and 1367 and under the doctrine of pendent jurisdiction. This Court has personal jurisdiction over the Parties to this Consent

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 6 of 86 PageID #: 304



Decree. Venue properly lies in this district pursuant to Section 505(c)(1) and (2) of the CWA, 33 U.S.C. § 1365(c)(1) and (2), Section 309(b) of the CWA, 33 U.S.C. § 1319(b), 28 U.S.C. §§ 1391(b) and (c), and 28 U.S.C. § 1395 because Defendant is located within this judicial district. The Defendant waives all objections it might have raised to such jurisdiction or venue.

III. APPLICABILITY

3. The provisions of this Consent Decree shall apply to and be binding upon the United States, Rhode Island, Citizen Plaintiffs, and upon Defendant and its officers, directors, agents, employees acting in their official capacities, successors, and assigns.

4. No transfer of any ownership interest in, or any interest in the operation of the Collection System or Water Pollution Control Plant, whether in compliance with this Paragraph or otherwise, shall relieve the Defendant of its obligation to ensure that the terms of this Consent Decree are implemented. Any transfer involving ownership or operation of the Collection System or Water Pollution Control Plant, or any portion thereof, to any other person or entity must be conditioned upon the transferee's agreement to undertake the obligations required by all provisions of this Consent Decree, as provided in a written agreement between the City and the proposed transferee, enforceable by the United States, Rhode Island, and Citizen Plaintiffs as third-party beneficiaries of such agreement. At least thirty (30) Days prior to such transfer, the Defendant shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the above-referenced proposed written agreement, to EPA, the United States Department of Justice, RIDEM, and Citizen Plaintiffs, in accordance with Section XV (Form of Notice).

5. The Defendant shall provide a copy of this Consent Decree to all officers, directors, employees, and agents whose duties might reasonably include compliance with any provisions of this Consent Decree. The Defendant shall also provide a copy of this Consent Decree to all contractors and consultants retained to perform any obligation required by this Consent Decree on behalf of the City, and condition any such contract upon performance of the work in conformity with the terms of this Consent Decree. The Defendant shall require that such contractors and consultants provide a copy of this Consent Decree to their subcontractors to the extent the subcontractors are performing work subject to this Consent Decree. Such contractors, consultants, and subcontractors shall be deemed agents of the City for the purposes of this Consent Decree. In an action to enforce this Consent Decree, the Defendant shall not assert as a defense against any action or proceeding by the United States, Rhode Island, or Citizen Plaintiffs the failure by any of its officers, directors, employees, agents, servants, consultants, engineering firms, contractors, subcontractors, successors, or assigns to take actions necessary to comply with this Consent Decree.

## IV. DEFINITIONS

6. Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in the CWA or in regulations promulgated under the CWA shall have the meaning ascribed to them in the CWA or in the regulations promulgated thereunder. Whenever the terms listed below are used in this Consent Decree, the following definitions shall apply:

a. "CWA" shall mean the Clean Water Act, as amended, 33 U.S.C. §§ 1251 *et seq.*

b. "Approval by EPA" or "Approved by EPA" shall mean the issuance of a written approval document from EPA, after a reasonable opportunity for review and comment by RIDEM, approving, approving with conditions, and/or modifying a submission in accordance with Section X (Approval of Submissions).

c. "Building/Private Property Backup" shall mean any release of wastewater from the Collection System into buildings or onto private property, except a release that is (1) the result of blockages, flow conditions, or malfunctions of a building lateral or other piping/conveyance system that is not owned or operationally controlled by the City, or (2) is the result of overland, surface flooding not emanating from the Collection System.

d. "Catchment" shall mean a subsystem of the Collection System in which a key manhole located at the outlet of the subsystem can be used to measure the Infiltration/Inflow that occurs within the subsystem.

e. "Collection System" shall mean the wastewater collection, storage and transmission system owned or operated by the City (including all devices, pump stations, force mains and sanitary and combined gravity sewer lines, manholes, and appurtenances thereto) and designed to convey wastewater to the Water Pollution Control Plant, or to other authorized discharge points.

f. "Combined Sewer Overflow" or "CSO" shall mean a discharge of partially treated or untreated wastewater from the collection system upstream of the headworks of the WPCP that results from flows exceeding the interceptor or regulator capacity of a Combined Portion of the Collection System as a result of inflow from precipitation or snow melt.

g. "Combined Portion of the Sewer System" shall mean that part of the Collection System designed or intended to convey domestic, commercial, and industrial wastewater and storm water in a single pipe to the Water Pollution Control Plant, or to other authorized discharge points. .

h. "Complaints" shall mean, collectively, the Complaint filed by the United States and Rhode Island and the Complaint filed by Citizen Plaintiffs in this action.

i. "Consent Decree" or "Decree" shall mean this Consent Decree and all appendices attached hereto. In the event of conflict between this Decree and any appendix, this Decree shall control.

j. "Date of Lodging" shall mean the Day Notice of Lodging of this Consent Decree is filed with the Clerk of the Court for the United States District Court for the District of Rhode Island, as reflected on the Court's docket.

k. "Day" shall mean a calendar day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next business day.

l. "Effective Date" shall have the definition provided in Section XVIII (Effective Date).

m. "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

n. "Excessive Infiltration/Inflow" or "Excessive I/I" shall mean the Infiltration/Inflow ("I/I") that can be cost-effectively eliminated from the Collection System as

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 10 of 86 PageID #: 308



determined by a cost-effectiveness analysis that compares the costs of eliminating the I/I with the total costs of transportation, storage, and treatment of the I/I (including capital costs of increasing sewage facilities capacity and treatment and the resulting operating costs).

o. "Flow" shall mean all wastewaters conveyed by any portion of the Collection System.

p. "Infiltration" shall mean the water that enters the Collection System (including sewer service connections) from the ground through such means as, but not limited to, defective pipes, pipe joints, connections, or manholes. Infiltration does not include, and is distinguished from, Inflow.

q. "Inflow" shall mean all water that enters the Collection System (including sewer service connections) from sources such as, but not limited to, roof leaders, cellar drains, yard drains, sump pumps, area drains, foundation drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers and sanitary sewers, catch basins, storm waters, surface runoff, street wash waters, or drainage. Inflow does not include, and is distinguished from, Infiltration.

r. "Infiltration/Inflow" or "I/I" shall mean the total quantity of water from both Infiltration and Inflow without distinguishing the source.

s. "Low Impact Development" or "LID" shall have the meaning given to that term by the Rhode Island Stormwater Design and Installation Standards Manual (as published in December 2010 or revised thereafter), and LID strategies and techniques are strategies and

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 11 of 86 PageID #: 309



techniques that employ the LID concept, regardless of whether they are part of a development or redevelopment project.

t. "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral or by an Arabic numeral followed by an upper or lower case letter.

u. "Parties" shall mean the United States, the State of Rhode Island, Citizen Plaintiffs, and the City of Newport.

v. "Plaintiffs," when used without modification or further designation, shall mean the Citizen Plaintiffs and the Government Plaintiffs.

w. "RIDEM" shall mean the Rhode Island Department of Environmental Management and any successor departments or agencies of the State.

x. "Sanitary Sewer Overflow" or "SSO" shall mean any overflow, spill, diversion, or release of wastewater from, or caused by, the Collection System upstream of the WPCP, excluding CSOs. SSOs include, but are not limited to, discharges to waters of the United States from the Collection System, as well as any release of wastewater from the Collection System to public or private property that does not reach waters of the United States, including Building/Private Property Backups.

y. "Separate Portion of the Collection System" shall mean that part of the Collection System designed or intended to convey domestic, commercial, and industrial sewage, and infiltration, consistent with standard engineering practices, to the Water Pollution Control Plant.

z. "Section" shall mean a portion of this Consent Decree identified by a

Roman numeral.

aa. "Sewershed" shall mean a major portion of the Collection System that drains to the CSOs designated as the Wellington Avenue Outfall or the Washington Street Outfall.

bb. "State" shall mean the State of Rhode Island.

cc. "United States" shall mean the United States of America.

dd. "Water Pollution Control Plant" or "WPCP" shall mean the wastewater treatment facility located at 250 Connell Highway, Newport, Rhode Island, owned and operated by the City of Newport to treat wastewater collected by Newport and adjacent communities.

## V. OBJECTIVES

7. It is the express purpose of the Parties in entering into this Consent Decree to require the Defendant to take all measures necessary to fulfill the objectives of the CWA, and to achieve and maintain compliance with the Newport RIPDES Permit, the General Storm Water Permit, the requirements of the CWA, the Rhode Island Act, and any applicable federal or State regulations.

8. Engineering designs and analyses required to be performed pursuant to this Consent Decree shall be conducted using sound, generally accepted engineering practices, and, as applicable, consistent with: (a) EPA's "Handbook: Sewer System Infrastructure Analysis and Rehabilitation," EPA/625/6-91-030, October 1991; (b) EPA's "Handbook for Sewer System Evaluation and Rehabilitation," EPA/430/9-75-021, December 1975; (c) EPA's CSO Policy; (d)

the currently effective edition of "Existing Sewer Evaluation and Rehabilitation," WEF MOP FD-6; (e) "Guide to Short Term Flow Surveys of Sewer Systems," WRC Engineering (Undated); (f) the National Association of Sewer Service Companies "Manual of Practice;" (g) the Massachusetts Department of Environmental Protection's document entitled "Guidelines for Performing Infiltration/Inflow Analysis and Sewer System Evaluation Survey," revised January 1993; (h) the currently effective edition of "TR 16: Guides for the Design of Wastewater Treatment Works;" and (i) EPA's "Combined Sewer Overflows: Guidance For Long-Term Control Plan," EPA 832-B-95-002, September 1995. Should there be a conflict between two or more of these sources, EPA's judgment as to which source to follow shall control.

VI. CIVIL PENALTY

9. The Defendant shall pay a civil penalty in the amount of $170,000 ("Civil Penalty"), together with interest accruing from the Date of Lodging, at the rate specified in 28 U.S.C. § 1961, to the United States and the State in satisfaction of the claims for civil penalties alleged in the Complaints.

10. a. The Defendant shall make payment of half of the Civil Penalty ($85,000) together with one-half of any interest, to the United States by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to the Defendant, following entry of the Consent Decree, by the United States Attorney's Office for the District of Rhode Island, Financial Litigation Unit, District of Rhode Island. The costs of such electronic funds transfer shall be the responsibility of the Defendant. At the time of payment, the Defendant shall send a copy of the EFT authorization form, the EFT

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 14 of 86 PageID #: 312



transaction record, and a transmittal letter, which shall state that the payment is for the Civil Penalty owed pursuant to the Consent Decree in Environment Rhode Island, et. al v. City of Newport, Rhode Island, and shall reference the civil action number and DOJ case number 90-5-1-1-09855, to the EPA and the United States Department of Justice as specified in Paragraph 109, by email to acctsreceivable.CINWD@epa.gov, and by mail to:

EPA Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

Payment of the civil penalty shall be made within thirty (30) days after entry of the Consent Decree. If the City fails to tender payment within thirty (30) days entry of this Consent Decree, then interest shall accrue on the debt to the United States, from the date of entry of this Consent Decree, at the rate provided for in 28 U.S.C. § 1961.

b. The Defendant shall make payment of the other half of the Civil Penalty ($85,000) together with one-half of any interest, to the State in the form of a certified or cashier's check made payable to "General Treasury - Water & Air Protection Program Account" and referencing this Consent Decree, and mailed to: DEM Office of Compliance and Inspection, 235 Promenade Street, Suite 220, Providence, Rhode Island 02908-5767. Payment of the civil penalty shall be made within thirty (30) days after entry of the Consent Decree. If the City fails to tender payment within thirty (30) days of entry of this Consent Decree, then interest shall accrue on the debt to the State of Rhode Island, from the date of entry of this Consent Decree, at the rate provided for in 28 U.S.C. § 1961.

## VII. REMEDIAL MEASURES

Collection System Operation and Maintenance

11. On August 31, 2010, the City submitted the following to EPA and RIDEM, using the best information available at the time of submission. The City shall update this information as new information becomes available or comes to light, and shall provide such updates as part of the reports required by Paragraph 78.b of this Consent Decree:

a. an inventory of its Collection System that characterizes the age, condition, type of construction, and operation of each element of its Collection System and provides for further assessments where warranted;

b. an assessment of the capacity of critical elements of the Collection System based upon available modeling;

c. an assessment of the City's preventive and reactive operation and maintenance practices (the "CMOM Program Self-Assessment") conducted in accordance with EPA's Guide for Evaluating Capacity, Management, Operation, and Maintenance (CMOM) Programs at Sanitary Sewer Collection Systems (EPA 305-B-05-002, January 2005) (which is attached as Attachment No. 1). As part of the CMOM Program Self-Assessment, the City shall complete and submit the Wastewater Collection System CMOM Program Self-Assessment Checklist (the "CMOM Program Self-Assessment Checklist") (see Attachment No. 2), which is a Region 1 modification of the checklist that accompanies the guidance in Attachment No. 1; and

d. a determination of whether improvements to the City's preventive maintenance practices are necessary in order to preserve the infrastructure of the Collection

System and to prevent future overflows from the Collection System.

12. On October 29, 2010, the City submitted a plan to correct any identified deficiencies (the "CMOM Corrective Action Plan") to RIDEM for review, and to EPA for review and Approval. The CMOM Corrective Action Plan shall include the following:

a. a list of any deficiencies identified by the CMOM Program Self-Assessment;

b. a list of causes and contributing factors that led to the unauthorized discharges identified in the CMOM Program Self-Assessment Checklist;

c. a description of the specific short- and long-term actions that the City is taking, or plans to take, in addition to those measures required by this document, to address any of the deficiencies identified during the completion of the CMOM Program Self-Assessment Checklist; and

d. a schedule for the implementation of the corrective actions identified in the CMOM Corrective Action Plan (the "CMOM Corrective Action Plan Implementation Schedule").

13. Upon Approval by EPA, the City shall implement the CMOM Corrective Action Plan submitted pursuant to Paragraph 12 in accordance with the approved CMOM Corrective Action Plan Implementation Schedule.

<u>Geographic Information System ("GIS") Map</u>

14. By May 31, 2011, the City shall develop, complete, and submit to RIDEM for review, and to EPA for review and Approval, a digital or GIS Map of the City's Collection

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 17 of 86 PageID #: 315



System and storm sewer system to facilitate the development and implementation of its extraneous flow reduction program. The GIS Map submitted on the above date shall include all information required below and collected following entry of this Consent Decree of the program in accordance with the prioritization of information necessary for required sequencing of program activities of the Remedial Measures described in this Consent Decree. At a minimum, the City shall prioritize the GIS mapping activities necessary to complete the Hydraulic Model required by Paragraph 58 by April 30, 2011 and shall include information gathered from activities necessary to identify and remediate public and private priority infiltration/inflow sources as required in Paragraphs 50.e and 54.e. Additional GIS mapping shall be conducted to further characterize the condition of the Collection System. Semi-annual updates of the GIS Map shall be provided to EPA and RIDEM on January 31st and July 31st of each year, starting January 31st 2012, and shall include the additional information that is collected during subsequent phases of the implementation of the Consent Decree pursuant to the reporting requirements contained in the Consent Decree. The mapping shall provide a comprehensive depiction of key infrastructure and factors influencing the proper operation and maintenance of the City's Collection System and storm sewer system. Mapping themes shall include: sanitary and storm sewer infrastructure, prior investigation and study findings, cleaning and repair activities, capital projects, and water resource and topographic features. The scale and detail of the maps shall be appropriate to facilitate an understanding of the Collection System and storm sewer system by the City, EPA, RIDEM, and the Citizen Plaintiffs. In addition, the mapping shall serve as a planning tool for the implementation of future extraneous flow reduction

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 18 of 86 PageID #: 316



remedies and shall delineate the extent of completed and planned investigations and corrections; and other related capital projects. To ensure legible mapping, information shall be grouped appropriately and represented thematically (e.g., by color-coding) with legends or schedules where possible. Mapping shall be updated as necessary to reflect new information, corrections or modifications. The following information and features, as modified with Approval, shall be included in the mapping:

**Base Map**

- Street names
- Private property delineations

**Infrastructure**

- Separate Portion of the Collection System (including inter-municipal connections);
- Combined Portion of the Collection System;
- Municipal separate storm sewer system (including inter-municipal and private connections where available);
- Thematic representation of sewer material, size, and age;
- Sewer flow direction and flow type (e.g., pressure, vacuum, gravity);
- Select rim and invert elevations (for comparison with water table and vertical separation between systems);
- Aerial delineations of major separate storm sewer catchment areas, sanitary sewersheds, combined sewersheds, and areas served by on-site subsurface disposal systems;
- Common/twin-invert manholes or structures (i.e., structures serving or housing both separate storm and sanitary sewers);
- Sanitary and storm sewer alignments served by known or suspected under drain systems;
- Sewer alignments with common trench construction and major crossings representing high potential for communication during high groundwater conditions;
- Pump stations (public and private), and other key sewer appurtenances;
- Sewersheds or sewer alignments experiencing inadequate level of service (with indication of reason(s));
- Location(s) of known sanitary sewer overflows ("SSOs") (with indication of cause(s)); and

- Location of all catch basins and their respective discharge locations

**Water Resources and Topographic Features**

- Water bodies and watercourses identified by name;
- Seasonal high water table elevations or sanitary sewer alignments impacted by groundwater; and
- Topography.

**Prior Extraneous Flow Investigations, Remediation, and Capital Projects**

- Alignments, dates, and thematic representation of work completed (with legend) of past extraneous flow investigations (e.g., flow isolation, dye testing, CCTV, etc.);
- A list of locations of suspected, confirmed, and corrected illicit discharges to the Separate Portion of the Collection System;
- Recent and planned sewer infrastructure cleaning and repair projects;
- Alignments and dates of past and planned Infiltration/Inflow ("I/I") investigations and sanitary sewer remediation work;
- Planned Collection System and storm sewer system capital projects; and
- Proposed phasing of future extraneous flow reduction measures.

Pump Station/Force Main Evaluations

15. On April 9, 2010, the City submitted to EPA and RIDEM a Scope of Work ("Pump Station/Force Main SOW"), Approved by EPA on May 5, 2010, outlining the tasks, methodology, and schedule for completion of a Pump Station/Force Main Assessment report that assesses the performance, hydraulic capacity, structural, and maintenance needs of all of the City's Collection System pump stations, force mains, emergency power, and alarm and telemetry systems (the "Pump Station/Force Main Assessment Report"). The Pump Station/Force Main Assessment Report shall identify remedial measures, along with a proposed implementation schedule, that are necessary to correct any deficiencies identified in the report. It shall also recommend whether further investigations, including cleaning and televising of the force mains, are warranted to assess their condition, to preserve the City's wastewater infrastructure, and to

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 20 of 86 PageID #: 318



prevent future force main failures. The Pump Station/Force Main Assessment Report shall include an inventory of the age, diameter, length, and material of construction of each of the City's pump station force mains. It shall further delineate the on-site evaluations, draw-down testing and assessments of the force main age, size, material of construction, frequency of pumping and the number of gallons pumped during each cycle that were the bases of the report's recommendations. The Pump Station/Force Main Assessment Report shall provide the rationale for excluding specific force mains from further investigations and shall also recommend the implementation of long-term preventive maintenance measures and a schedule for their implementation.

16. On September 29, 2010, the City completed the investigations pursuant to the City's Pump Station/Force Main Evaluation SOW and EPA's May 5, 2010 e-mail Approval. Upon Approval by EPA of the Pump Station/Force Main Assessment Report, the City shall implement the recommended remedial measures in accordance with the approved schedule.

Water Pollution Control Plant ("WPCP") Flow Optimization

17. Beginning March 1, 2010, the City initiated a WPCP pilot program (the "WPCP Flow Optimization Study") in accordance with the November 12, 2009 CH2M HILL Standard Operating Procedures. The City shall continue to perform the WPCP Flow Optimization Study for a one-year period. The WPCP Flow Optimization Study shall evaluate the WPCP's performance and the impacts associated with increasing the monthly average flow discharged from the WPCP from 10.7 million gallons per day ("MGD") to 15.7 MGD including impacts of equipment that was not fully functional during the testing period. During the WPCP Flow

Optimization Study the City shall comply with the sampling protocols included in CH2M HILL's November 12, 2009 Standard Operating Procedures.

18. During the WPCP Flow Optimization Study, the City shall evaluate alternatives to increase the monthly average flows to the WPCP while maintaining compliance with the remaining conditions of its RIPDES permit, including Chemically-Enhanced Primary Treatment ("CEPT"), adequate screening and changes to the design and sizing of the facility headworks. As part of the Flow Optimization Study, the City shall evaluate the technical feasibility, cost-benefit and regulatory aspects of implementing CEPT at its WPCP.

19. On March 31, 2010, the City submitted the CEPT Scope of Work ("CEPT SOW") to RIDEM for review, and to EPA for review and Approval, outlining the jar testing and other bench scale testing that shall be conducted during the WPCP Flow Optimization Study. Full evaluation of the feasibility of CEPT, if required, shall be included in development of the System Master Plan pursuant to Paragraph 65. It is understood that by conducting this CEPT evaluation, the City makes no commitment to implement CEPT at the WPCP.

20. The City shall complete the investigations outlined in the City's CEPT SOW, as revised and resubmitted on June 17, 2010. A description of the investigations and the results shall be included in the WPCP Flow Optimization Study Report submitted pursuant to Paragraph 21.

21. On March 30, 2011, the City submitted an engineering evaluation of the WPCP Flow Optimization Study summarizing the results of its investigations and the projected effect on the frequency and duration of the overflows at the Wellington Avenue and Washington Street

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 22 of 86 PageID #: 320



outfalls to RIDEM for review, and to EPA for review and Approval. This WPCP Flow Optimization Study Report shall include recommendations for the future operation of the WPCP during wet weather and a schedule for implementation of the recommendations. The WPCP Flow Optimization Study Report shall also include a recommendation on the appropriate monthly average flow limit to be included in the City's RIPDES permit.

22. Upon Approval by EPA, the City shall implement the recommendations of the WPCP Flow Optimization Study Report.

Water Pollution Control Plant ("WPCP") Repairs

23. Consistent with Newport's January 25, 2011 letter to RIDEM, responding to deficiencies noted in RIDEM's December 17, 2010 letter following its December 2010 WPCP inspection (Attachment No. 3), the City shall complete the following repairs to the WPCP by the dates indicated below:

a. Return four (4) aerated grit blowers to operational condition by June 2011.

b. On April 15, 2011, all six (6) primary clarifiers were returned to operational condition.

c. Return all four (4) secondary clarifiers to full operational condition by June 15, 2011.

d. Return five (5) chlorine feed pumps to operational condition by July 2011.

e. Retrofit all three (3) primary effluent pumps; one (1) by December 31, 2011, two (2) by June 31, 2012, and all three (3) by December 31, 2012

f. On April 29, 2011, the City submitted a plan and schedule to repair all

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 23 of 86 PageID #: 321



solids handing equipment in compliance with the RIDEM Sludge Order of Approval and the approved Operations and Maintenance manual, or, to redesign the facility's solids handling processes to meet present and future needs. If the City determines that new equipment is required or intends to permanently abandon existing equipment, the appropriate applications for approval (i.e. construction and sludge order of approvals) and Operations and Maintenance manual updates must be submitted to RIDEM

g. By April 1, 2011, appropriate metering equipment to accurately record the volumes of solids removed from the WPCP for disposal was installed and operational.

Wellington Avenue and Washington Street Treatment Facilities

24. The City shall conduct monitoring of the influents to, and discharges from, the Wellington Avenue and Washington Street outfall overflows in accordance with the monitoring plan included as Attachment No. 4, including any modifications to monitoring locations delineated therein. The monitoring results shall be submitted to EPA and the RIDEM within 15 calendar days of the month in which the monitoring was conducted as a separate attachment to the monthly Discharge Monitoring Report (DMR) for the WPCP.

25. On August 31, 2010, the City submitted an engineering evaluation of the operation of the Wellington Avenue treatment facility, the Narragansett Avenue Storage Conduit and the Washington Street treatment facility to RIDEM for review, and to EPA for review and Approval. The evaluation is required to include recommendations for optimizing the operation of the evaluated facilities pending the completion of long-term remedial measures and a proposed schedule for implementing the recommendations.

26. Upon Approval by EPA, the City shall implement the recommendations for optimizing the operation of the evaluated facilities.

27. By May 31, 2011, the City shall finalize and submit to RIDEM for review, and to EPA for review and Approval, its Operations and Maintenance Plan that integrates the operations of the WPCP, Wellington Avenue pump station, the Narragansett Avenue Storage Conduit, and the Washington Street pump station to maximize the level of treatment of wet-weather flows pending the implementation of a final remedy to eliminate overflows.

28. The City shall implement the Operation and Maintenance Plan submitted pursuant to Paragraph 27 upon its Approval by EPA.

Preference for Low Impact Development

29. The City shall encourage the use of low impact development (LID) strategies and techniques as the means of reducing Infiltration and Inflow to the Collection System..

30. The City shall comply with the provisions of the Rhode Island Stormwater Design and Installation Standards Manual (as published in December 2010 or revised thereafter), and shall give preference to low impact development (LID) as specified therein.

Wellington Avenue Outfall Sewershed Prior Extraneous Flow Investigations

31. On June 1, 2010, Newport submitted a review of the recommendations contained in all prior extraneous flow investigations in the catchments tributary to the Wellington Avenue Overflow Outfall regarding public sources of extraneous flow and a consolidated summary and plan (the "Initial Wellington Avenue Extraneous Flow Remedial Plan") to RIDEM for review, and to EPA for review and Approval, .

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 25 of 86 PageID #: 323



32. Upon Approval by EPA, the City shall implement the recommendations contained in the Initial Wellington Avenue Extraneous Flow Remedial Plan in accordance with the approved Initial Wellington Avenue Extraneous Flow Remedial Plan Implementation Schedule.

Initial Collection System Remediation and Replacement Measures

33. The City shall complete the projects identified in Paragraphs 34 to 47 in accordance with the schedules delineated hereunder. For the purposes of these Paragraphs, the date of the completion of the projects shall be the date the constructed facilities were placed into operation, and does not necessarily include completion of peripheral tasks of the projects such as street repair, clean-up, or other activities that may depend on other City departments or functions. Upon submission of the notification of the completion of each project, the City shall submit a schedule for completion of any remaining peripheral tasks.

34. On November 20, 2009, the City completed rehabilitation and replacement of the Long Wharf Force Main Project and permanently sealed the Long Wharf CSO (Outfall 003A). In November, 2009, the City issued a "Notice to Proceed" with the construction of the Railroad Interceptor Sanitary Sewer Line Improvement Project.

35. On or before June 30, 2010, the City completed construction of the Railroad Interceptor Sanitary Sewer Line Improvement Project.

36. On February 1, 2010, the City initiated construction of the replacement of approximately 8500 linear feet of sanitary sewers on 20 different streets deemed the High Priority Sewer Pipe Replacement Project in the City's September 4, 2009 letter to EPA, the RIDEM, and Citizen Plaintiffs.

37. On December 28, 2010, the City submitted a letter regarding revisions to the High Priority Sewer Pipe Replace Project described above. This letter addressed the City's reported discovery of soils regulated by the RIDEM Office of Waste Management ("Regulated Soils") at previously identified segments of the Project, the subsequent suspension of replacement of affected segments, a list of the suspended segments, and a list of the segments where replacement work is proceeding.

38. By December 28, 2010, the City completed construction of the replacement of approximately 3,700 linear feet of sanitary sewers on eight different streets identified in the High Priority Sewer Pipe Replacement Project.

39. By July 31, 2011, the City shall submit a revised plan to address sewer pipes not replaced as part of High Priority Sewer Pipe Replacement Project referenced in Paragraph 36, because of the reported discovery of Regulated Soils at these locations ("Revised High Priority Replacement Plan"). The Revised High Priority Replacement Plan shall also include the identification of additional high priority sewer pipe replacement or rehabilitation projects identified through the Wellington Avenue Outfall Additional Extraneous Flow Investigations (Paragraphs 50 and 51, below) or other studies undertaken by the City. The Plan shall include a schedule for the design and construction of all necessary work.

40. On March 1, 2010, the City initiated the disconnection of the storm water catch basins identified in the Amendment to the Phase I Part 2 Catchment Area 6 report prepared by Earth Tech Inc. for which the plans and specifications were submitted to the RIDEM on July 1, 2009.

41. By June 30, 2010, the City had substantially completed the disconnection of the storm water catch basins identified in the Amendment to the Phase I Part 2 Catchment Area 6 report.

42. On April 29, 2010, the City submitted plans and specifications for the Wellington Avenue Interceptor Replacement project, as delineated in the March 2009 Phase 2 CSO Control Plan, Wellington Avenue CSO Facility, ("Phase 2 Plan") submitted to the RIDEM.

43. On October 13, 2010, the City submitted plans and specifications for the Thames Street Interceptor Rehabilitation project, as delineated in the Phase 2 Plan.

44. On August, 11, 2010, the City awarded a contract for construction of the Wellington Avenue Interceptor Replacement project, as delineated in the Phase 2 Plan.

45. On October 13, 2010, the City awarded a contract for construction of the Thames Street Interceptor Rehabilitation project, as delineated in the Phase 2 Plan.

46. By April 30, 2011, the City shall complete construction of the Wellington Avenue Interceptor Replacement project, as delineated in the Phase 2 Plan.

47. By June 30, 2011, the City shall complete construction of the Thames Street Interceptor Rehabilitation project, as delineated in the Phase 2 Plan.

Wellington Avenue Outfall Sewershed Private Extraneous Flow Investigations

48. On December 23, 2010, Newport submitted a report containing street maps of the Sewershed tributary to the Wellington Avenue Outfall to RIDEM for review, and to EPA for review and Approval, This map shall delineate the location of all properties within the Sewershed, the location of each property that was inspected, and the location of each property

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 28 of 86 PageID #: 326



that was determined to be an actual, or potential, source of extraneous flow to the Collection System during the Phase I, Part 2 Sewer System Evaluation Survey ("SSES") or any of the City's other investigations. The map shall highlight those properties that have disconnected extraneous flows from the Collection System as well as those properties that the City has yet to inspect due to refused entry or lack of response. The City shall supplement the map with:

a. a description and address listing of all private sources of extraneous flow tributary to the Wellington Avenue Outfall identified during the Phase I, Part 2 SSES or other extraneous flow investigations;

b. a listing of all private sources of extraneous flow that have implemented remedial measures;

c. the type of remedial measure that was implemented;

d. the date the remedial measure was implemented;

e. the date that the property was re-inspected to verify that the extraneous flow remains redirected;

f. the measures that the City plans to use in the future to verify the redirection of private sources of extraneous flow, and a schedule for their implementation;

g. the measures that the City plans to implement to require elimination of remaining private sources of excessive infiltration and inflow and to redirect such flows, including a schedule for implementation of such measures; and

h. the measures that the City plans to take to inspect those remaining properties where entry has been refused or an inspection has not been conducted due to a lack of

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 29 of 86 PageID #: 327



response and a schedule for their implementation.

49. Upon Approval by EPA, the City shall implement the measures submitted pursuant to Paragraph 48 in accordance with the approved schedules.

Wellington Avenue Outfall Additional Extraneous Flow Investigations

50. By July 31, 2011, the City shall submit to RIDEM for review, and to EPA for review and Approval, a report delineating the results of the additional I/I investigations conducted to identify and quantify extraneous sources of groundwater, tidal, and rainfall-induced infiltration, and inflow within the Wellington Avenue Sewershed (the "Wellington Avenue Outfall Additional Extraneous Flow Investigations Report"). The Wellington Avenue Outfall Additional Extraneous Flow Investigations Report shall include a description of the catchments that are tributary to, or contribute to, the Wellington Avenue Outfall and shall:

a. include a map of the Sewershed that delineates all catchments, streets, water courses, the location of all key manholes, all major branch, trunk, and interceptor sewers, pump stations, force mains, overflow points, and wastewater treatment facilities. The map(s) must also differentiate force mains from gravity sewers, provide the direction of flow and indicate the size of all interceptor sewers. The boundaries of each catchment being investigated must be clearly indicated. The degree that each catchment is broken down to sub-catchments for the purpose of identifying extraneous flow sources shall be determined by the significance of extraneous flow from that catchment. A prioritization scheme and assessment of cost-benefit shall be developed as part of the task and in conjunction with flow information collected through the metering program described above;

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 30 of 86 PageID #: 328



b. quantify groundwater, tidal infiltration, and inflow components of extraneous flow during periods of wet weather and high and low groundwater for each catchment;

c. identify and quantify the level of peak rainfall-induced infiltration for each catchment by evaluating continuous flow monitoring records for the period beginning no earlier than 12 hours after the end of a 1.00" or greater storm event measured during a 24-hour period, and ending no later than 24 hours following the same event;

d. include the City's rationale for excluding additional I/I investigations in any portion of any catchment that is tributary to, or contributes to, the Wellington Avenue Outfall Overflow;

e. include the results of the additional flow isolation and public and private inflow priority investigations conducted by the City in those catchments that were established as a result of the City's review of the individual hydrographs for each of its continuous monitoring locations. The remedial measures recommended to resolve these identified priority sources of public and private infiltration/inflow and the related implementation schedules shall constitute a separate section of the Report; and

f. include recommendations for the additional extraneous flow investigations of catchments determined to contain excessive I/I, necessary to identify and quantify both public and private sources of groundwater, tidal, and rainfall-induced infiltration and inflow. The additional extraneous flow investigation recommendations and Wellington Avenue SSES implementation schedule shall constitute a separate section within the Wellington Avenue

Additional Extraneous Flow Investigations Report and shall constitute the Wellington Avenue Outfall SSES Scope of Work ("Wellington Avenue Outfall SSES SOW").

51. Upon Approval by EPA, the City shall implement the identified priority remedial measures as well as the additional extraneous flow investigations included in the Wellington Avenue Outfall SSES SOW and submit a Wellington Avenue SSES Report to EPA and RIDEM in accordance with the approved schedule.

Contents of Wellington Avenue SSES Report

52. The Wellington Avenue SSES Report shall identify remaining sources of Excessive I/I, and shall include a comprehensive plan for their elimination. The report will prioritize projects for removal of I/I considering the amount of I/I, the location, the type of remedial action and other factors. The report shall include, but need not be limited to the following information for the catchments that are tributary to, or contribute to, the Wellington Avenue Outfall Overflow:

**Infiltration/Inflow - Public Sources**

a. an updated listing of all public sources of I/I;

b. a listing of the public sources of I/I that were determined to be excessive;

c. cost-effectiveness analyses that determine which public sources of I/I are more cost-effective to remediate than to transport and treat, and a narrative description of the bases of the analyses;

d. proposals for rehabilitating or replacing each structurally-deficient component identified during the Wellington Avenue SSES, and a schedule for implementing the

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 32 of 86 PageID #: 330



recommended rehabilitation/replacement measures, including engineering design and construction; and

e. proposals for rehabilitating each public source of excessive I/I that include engineering design and construction, and a schedule for implementing the proposals.

**Infiltration/Inflow - Private Sources**

f. For each catchment in which excessive rainfall-induced private infiltration or inflow is determined to exist pursuant to the procedures detailed above, the Wellington Avenue SSES Report shall include, but need not be limited to, the following information:

i. an update of the map, address listing and other information required pursuant to Paragraph 48 of this document;

ii. a determination of whether it is more cost-effective to redirect identified private sources of extraneous rainfall-induced infiltration and inflow or to modify the Collection System to convey the extraneous flow to the City's WPCP. The analysis shall include, but need not be limited to:

(1) a generalized/schematic level assessment of whether conditions permit redirection of the identified sources to the ground and the range of homeowner costs associated with this type of remedial measure;

(2) an assessment of the availability of storm sewers and storm sewer capacity including whether the municipal storm sewer system can be extended to receive the identified extraneous flow sources and the range of homeowner costs associated with this type of remedial measure;

(3) an assessment of the cost of conveying the extraneous flow to the WPCP without exacerbating downstream overflows;

(4) recommendations regarding the disposition of each identified private source of extraneous flow;

(5) the framework of a City-wide public education plan to promote the elimination of private sources of rainfall-induced infiltration and inflow and a schedule for the plan's implementation;

(6) an evaluation of whether changes in the City's ordinances or by-laws are necessary to implement or facilitate the planned remedial measures. If the City determines that changes in the City's ordinances or by-laws, or in the ordinance(s) of other entities that contribute wastewater to the City's Collection System are necessary to implement or facilitate the planned remedial measures, the City shall submit a proposed schedule for implementing said ordinances or by-laws, and shall notify the other entities that contribute wastewater to the City's Collection in writing of the changes requested to their ordinances; and

(7) a schedule to implement the private extraneous source reduction recommendations of the SSES.

<u>Wellington Avenue SSES Report Implementation Schedule</u>

53. Upon Approval by EPA, the City shall implement the recommendations of the Wellington Avenue SSES Report in accordance with the approved schedules.

<u>Washington Street Outfall Sewershed Extraneous Flow Investigations</u>

54. By September 30, 2011, the City shall submit a report to RIDEM for review, and

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 34 of 86 PageID #: 332



to EPA for review and Approval, delineating the results of the additional I/I investigations conducted to identify and quantify extraneous sources of groundwater, tidal, and rainfall-induced infiltration, and inflow within the Washington Street Sewershed (the "Washington Street Outfall Additional Extraneous Flow Investigations Report"). The Washington Street Outfall Additional Extraneous Flow Investigations Report shall include a description of the catchments that are tributary to, or contribute to, the Washington Street Outfall and shall:

a. include a map of the Sewershed that delineates all catchments, streets, water courses, the location of all key manholes of the Collection System where the City conducted flow monitoring during the investigations, all major branch, trunk, and interceptor sewers, pump stations, force mains, overflow points, and wastewater treatment facilities. The map(s) must also differentiate force mains from gravity sewers, provide the direction of flow and indicate the size of all interceptor sewers. The boundaries of each catchment being investigated must be clearly indicated;

b. quantify groundwater and tidal infiltration, and inflow components of extraneous flow during periods of high and low groundwater for each catchment;

c. identify and quantify the level of peak rainfall-induced infiltration for each catchment by evaluating continuous flow monitoring records for the period beginning no earlier than 12 hours after the end of a 1.00" or greater storm event measured during a 24-hour period, and ending no later than 24 hours following the same event;

d. include the City's rationale for excluding additional I/I investigations in any portion of any catchment that is tributary to, or contributes to, the Washington Street Outfall

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 35 of 86 PageID #: 333



Overflow;

e. include the results of the additional flow isolation and public and private inflow priority investigations conducted by the City in those catchments that were established as a result of the City's review of the individual hydrographs for each of its continuous monitoring locations. The remedial measures recommended to resolve these identified priority sources of public and private infiltration/inflow and the related implementation schedules shall constitute a separate section of the Report; and

f. include recommendations for the additional extraneous flow investigations of those catchments determined to contain Excessive I/I necessary to identify and quantify both public and private sources of groundwater, tidal and rainfall-induced infiltration, and inflow. The additional extraneous flow investigation recommendations and Washington Street SSES implementation schedule shall constitute a separate section within the Washington Street Additional Extraneous Flow Investigations Report and shall constitute the Washington Street Outfall SSES Scope of Work ("Washington Street Outfall SSES SOW").

55. Upon Approval by EPA, the City shall implement the identified priority remedial measures and the additional extraneous flow investigations included in the Washington Street Outfall SSES SOW and submit a Washington Street SSES Report ("Washington Street SSES Report") to EPA and RIDEM in accordance with the approved schedule.

<u>Contents of the Washington Street SSES Report</u>

56. The Washington Street SSES Report shall identify remaining sources of Excessive I/I, and shall include a comprehensive plan for their elimination. The report will

prioritize projects for removal of I/I considering the amount of I/I, the location, the type of remedial action and other factors. It shall include, but need not be limited to the following information for the catchments that are tributary to, or contribute to, the Washington Street Outfall Overflow:

**Infiltration/Inflow - Public Sources**

a. an updated listing of all public sources of I/I;

b. a listing of the public sources of I/I that were determined to be excessive;

c. cost-effectiveness analyses that determine which public sources of I/I are more cost-effective to remediate than to transport and treat, and a narrative description of the bases of the analyses;

d. proposals for rehabilitating or replacing each structurally-deficient component identified during the Washington Street SSES, and a schedule for implementing the recommended rehabilitation/replacement measures, including engineering design and construction; and

e. proposals for rehabilitating each public source of excessive I/I that include engineering design and construction, and a schedule for implementing the proposals.

**Infiltration/Inflow - Private Sources**

f. identification of each catchment that contributes to the Washington Street Outfall Overflow in which excessive rainfall-induced infiltration or inflow is determined to exist;

g. For each catchment in which excessive rainfall-induced infiltration or inflow is determined to exist pursuant to the procedures detailed above, the Washington Street

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 37 of 86 PageID #: 335



SSES Report shall include, but need not be limited to, the following information:

i. an update of the map, address listing and other information required pursuant to Paragraph 48 of this document;

ii. a determination of whether it is cost-effective to redirect identified private sources of extraneous rainfall-induced infiltration and inflow or to modify the Collection System to convey the extraneous flow to the City's WPCP. The analysis shall include, but need not be limited to:

(1) a generalized/schematic level assessment of whether conditions permit redirection of the identified sources to the ground and the range of homeowner costs associated with this type of remedial measure;

(2) an assessment of the availability of storm sewers and storm sewer capacity including whether the municipal storm sewer system can be extended to receive the identified extraneous flow sources and the range of homeowner costs associated with this type of remedial measure;

(3) an assessment of the cost of conveying the extraneous flow to the WPCP without exacerbating downstream overflows;

(4) recommendations regarding the disposition of each identified private source of extraneous flow; and

(5) a schedule to implement the private extraneous source reduction recommendations of the SSES.

Washington Street SSES Report Implementation Schedule

57. Upon Approval by EPA, the City shall implement the recommendations of the Washington Street SSES Report in accordance with the approved schedules.

Hydraulic Model And Report

58. On April 29, 2011, the City prepared and submitted to RIDEM for review, and to EPA for review and Approval, an updated report (the "Hydraulic Modeling Report") on its hydraulic model of the Collection System (the "Model") that includes all areas tributary to the WPCP. The Model shall evaluate portions of the Collection System that include contiguous interceptor sewers, 12-inch and greater (unless modeling of smaller diameter sewers is necessary for adequate model calibration/verification) that are upstream of the Wellington Avenue and Washington Street outfalls. Isolated surcharges shall be addressed under the Sewer System Evaluation Surveys for the respective Sewersheds that will be prepared pursuant to Paragraphs 52 and 56. The City shall use the Model to:

a. assess the hydraulic capacity of each catchment that is tributary to, or which contributes to, the Wellington Avenue and Washington Street Overflows;

b. identify the appropriate remedial measures to address all capacity limitations identified in the Collection System;

c. provide a detailed understanding of the Collection System's response to seasonal groundwater conditions, tidal fluctuations, and wet-weather events; and

d. evaluate the impacts of the proposed remedial measures and related removal of extraneous flows.

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 39 of 86 PageID #: 337



59. The City shall configure the Model to accurately represent the Collection System that is tributary to, or which contributes to, the Wellington Avenue and Washington Street Outfall overflows in accordance with currently accepted engineering practice. The City may model its Collection System in different levels of detail and with different types of models, as necessary, to identify the causes of all known capacity-related overflows and to assess proposed remedial measures to eliminate those overflows. The City shall also identify critical antecedent and seasonal Collection System flow contributions that contribute to the capacity-related overflows.

60. The City shall configure the Model using adequate, accurate, and sufficiently current physical data (including, but not limited to, invert and ground elevations, pipe diameters, slopes, pipe run lengths, Manning roughness factors, manhole sizes and configurations, and pump station performance factors) for its Collection System. In particular, the City shall sufficiently field verify physical data to allow calibration and verification of the Model.

61. The City shall calibrate and verify the Model using appropriate rainfall data, actual hydrographs and Collection System flow data. The City shall use an approved data set(s) for calibration and verification. As part of the calibration process, the City shall either use existing sensitivity analyses for the selected Model, or carry out its own sensitivity analyses, such that calibration effectiveness is maximized.

62. The Hydraulic Modeling Report submitted pursuant to Paragraph 58 shall include the following:

a. a description of the Model;

b. specific attributes, characteristics, and limitations of the Hydraulic Model;

c. identification of all input parameters, constants, assumed values, and expected outputs;

d. digitized map(s) and schematics that identify and characterize the portions (including the specific gravity sewer lines) of the Collection System that shall be included in the Model;

e. identification of input data to be used;

f. configuration of the Model;

g. procedures and protocols for performance of sensitivity analyses (i.e., how the Model responds to changes in input parameters and variables);

h. procedures for calibrating the Model to account for values representative of the Collection System actual system data (e.g., flow data); and

i. procedures to verify the Model's performance using additional, independent actual system and WPCP data (e.g., flow data).

Collection System Capacity Assessment

63. By November 30, 2012, the City shall submit a professional engineering evaluation of the conveyance capacity of all Sewersheds that are tributary to, or contribute to, capacity-related overflows, including the overflows from the Wellington Avenue and Washington Street Outfalls (the "Capacity Assessment") to RIDEM for review, and to EPA for review and Approval. The Capacity Assessment shall utilize the Model developed pursuant to Paragraphs 58 through 62 of this document and shall include an evaluation of all interceptor

sewers, pump stations, force mains and known areas of Collection System surcharges, and any other portions of the Collection System that must be assessed so as to allow for a technically-sound evaluation of the causes of all capacity-related overflows. It shall also:

a. identify the capacities of the portions of the Collection System upstream and downstream of the Wellington Avenue and Washington Street Outfalls and compare those capacities to existing and future projected wet-weather flows. The Capacity Assessment shall identify those portions of the Collection System that experience, have caused, or are expected to cause or contribute to capacity-related Building/Private Property Backups, Collection System surcharges or overflows, or overflows from the Wellington Avenue or Washington Street outfalls;

b. consider local rainfall data, critical antecedent in-system flow conditions, and the impact of a range of rainfall events (based on return frequency and duration for an appropriate continuous period of rainfall records) on peak wet-weather flows within those portions of the City's Collection System that are tributary to, or contribute to, capacity-related overflows, including the Wellington Avenue and Washington Street Outfall overflows;

c. characterize the Collection System performance by identifying, for each condition considered, each pipe segment operating in surcharged condition and each manhole or structure at which a surcharged condition or overflow might be expected to occur;

d. include as a separate section a summary detailing the progress made to date on the improvements to the Collection System to eliminate overflows from the Wellington Avenue and Washington Street outfalls;

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 42 of 86 PageID #: 340



e. include recommendations and a schedule for the implementation of structural measures required to prevent Collection System surcharges and overflows. The analyses shall also include a map noting the location of any potential relief or replacement sewers and size of all downstream interceptors and pumping stations; and

f. evaluate the City's ability to eliminate the Wellington Avenue and Washington Street Outfall overflows based on the Collection System work performed and Collection System rehabilitation and remedial measures planned for the future.

64. Upon Approval by EPA, the City shall implement the recommendations of the Capacity Assessment in accordance with the approved schedules.

65. If the City determines that its proposed Collection System replacement and rehabilitation remedial measures, its public infiltration/inflow, private rainfall-induced infiltration and inflow removal programs, and its WPCP flow optimization will not result in the elimination of overflows, including overflows from the Wellington Avenue and Washington Street Outfalls, then the Capacity Assessment shall include an identification and evaluation of additional measures to eliminate such overflows ("System Master Plan") including, but not limited to implementation of CEPT, off-line and in-line storage, upgrades to the WPCP to increase its design flow, and pump back storage (e.g., tunnels). The System Master Plan shall also integrate the results of the WPCP evaluation and the CEPT feasibility studies, along with other measures including the City's on-going Collection System replacement and rehabilitation remedial measures, sewer separation options, the City's public infiltration/inflow and private rainfall-induced infiltration and inflow removal programs, and other specific short- and long-

term measures for preventing (and, to the extent they may not be able to be prevented, for controlling and treating) overflows. If the System Master Plan determines that overflows from the Wellington Avenue and Washington Street outfalls cannot be eliminated, the System Master Plan shall also include all the information required by EPA's "Combined Sewer Overflows: Guidance For Long-Term Control Plan," EPA 832-B-95-002, September 1995, so that the RI DEM and EPA can determine if, and under what conditions, certain overflows may be authorized under applicable statutory or regulatory requirements.

66. The System Master Plan shall include a schedule for complete implementation of recommended measures and remedial work by June 30, 2018, unless, based on the review and regulatory Approval of the recommendations of the System Master Plan, an alternate end date is agreed upon by the Parties.

67. Upon Approval by EPA, the City shall implement the measures submitted pursuant to Paragraph 65 and 66 in accordance with the approved schedules.

68. At all times prior to the date by which the Defendant is required to achieve compliance with Paragraph 67, the Defendant shall operate the WPCP and Collection System to maximize compliance with the CWA, the Rhode Island Act, and the Newport RIPDES Permit.

<u>Rainwater Harvesting Systems</u>

69. The Defendant shall implement in accordance with the following schedule a program to purchase, promote, and install rainwater harvesting systems designed to capture runoff from rooftops where roof drainage systems are now connected or directly tributary to the sanitary sewer system and store the water for nonpotable uses, such as lawn and garden

watering, in order to reduce inflow into the Collection System:

a. By September 30, 2011, the Defendant shall purchase a minimum of 500 rainwater harvesting systems of a minimum capacity of 55 gallons for use on City buildings, residential buildings, or business buildings within the City of Newport.

b. By October 31, 2011, The Defendant shall undertake publicity and a public education campaign to promote awareness of rainwater harvesting systems and encourage their use.

c. The Defendant shall provide technical support for installation and use of rainwater harvesting systems to residents and businesses through September 30, 2012.

d. By June 30, 2012, the Defendant shall have completed the installation of rainwater harvesting systems in City buildings and will have used best efforts to complete distribution of any systems to residents or businesses within Newport.

e. If Newport is unable to install or distribute all rainwater harvesting systems by June 30, 2012, it shall seek EPA Approval for the donation of the systems to organizations or other towns near Newport for the use or further distribution by these entities.

## VIII. STORMWATER FROM EASTON'S POND MOAT

70. This section of the Consent Decree is applicable to the claims raised by Citizen Plaintiffs under the General Stormwater Permit. The Citizen Plaintiffs have alleged that the discharges to Easton's Beach from Easton's Pond Moat ("the Moat discharge") are in violation of the General Permit and the City, while denying those allegations, has chosen to install and operate an ultraviolet treatment system to remove bacteria from the stormwater discharged from

Easton's Pond Moat.

71. On or before May 27, 2011 (the beginning of Memorial Day weekend), the City shall have installed the ultraviolet treatment system or some other mechanism for reducing the bacteria content of the Moat discharge ("the treatment system") and shall have taken the steps necessary to make that system operational. Provided that the City receives sufficient cooperation from the Department of Transportation ("DOT") to permit such relocation, the City will also relocate DOT's Easton's Beach stormwater outfall such that it discharges into Easton's Pond Moat ("the Moat") at a point upstream from the treatment system.

72. Thereafter, the City shall conduct a monitoring program to measure the level of *Enterococcus* bacteria in Easton's Pond Moat as set forth in this section of the Consent Decree. The monitoring program shall be conducted over the period from the beginning of Memorial Day weekend through the end of Labor Day weekend (the "monitoring season"), and shall be conducted in accordance with the specifications contained herein. The storm events selected for monitoring shall be selected in an attempt to conduct a representative sampling of storm events over the monitoring season.

73. During 2011, such monitoring will be conducted during five separate storm events. If the geometric mean *Enterococcus* value in the effluent channel immediately downstream from the treatment system is 104 colonies/100 milliliters of effluent ("104 cfu") or lower for all five of these storm events, then the City need only conduct such monitoring during three separate storm events during the 2012 monitoring season. If the geometric mean *Enterococcus* value in the effluent channel immediately downstream from the treatment system

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 46 of 86 PageID #: 344



is higher than 104 cfu for any one or more of these five 2011 storm events, then the City will conduct such monitoring during four separate storm events during the 2012 monitoring season.

74. If the geometric mean *Enterococcus* value in the effluent channel immediately downstream from the treatment system is 104 cfu or lower for all of the storm events sampled in 2012 in accordance with the preceding paragraph, then the City need conduct no further monitoring of the Moat discharge under this Consent Decree. If the geometric mean *Enterococcus* value in the effluent channel immediately downstream from the treatment system is higher than 104 cfu for one or more of the storm events sampled in 2012 in accordance with the preceding paragraph, then the City will conduct such monitoring during the 2013 monitoring season for as many storm events as were required to be monitored during the 2012 monitoring season.

75. If the geometric mean *Enterococcus* value in the effluent channel immediately downstream from the treatment system is 104 cfu or lower for all of the storm events sampled in 2013 in accordance with the preceding paragraph, then the City need conduct no further monitoring of the Moat discharge under this Consent Decree. If the geometric mean *Enterococcus* value in the effluent channel immediately downstream from the treatment system is higher than 104 cfu for one or more of the storm events sampled in 2013 in accordance with the preceding paragraph, then the Citizen Plaintiffs and the City shall conduct informal negotiations as to the appropriate additional measures to be taken to ensure compliance with the 104 cfu standard, and the City shall implement the agreed measures. Should they not be able to agree, either the Citizen Plaintiffs or the City may apply to the Court for relief.

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 47 of 86 PageID #: 345



76. For each storm event monitored under the provisions of this section of the Consent Decree, the monitoring shall be conducted as is set forth in this paragraph.

a. All sampling will be done using current approved EPA or State of Rhode Island sampling guidance, and the resultant samples will be handled and analyzed in accordance with 40 C.F.R. Part 136.

b. Monitoring of Influent to and Effluent from Treatment System.

i. During each storm event, a minimum of five grab samples will be collected from both the influent to and the effluent from the treatment system. The first of these samples will, if reasonably possible, be taken during the "first flush" of the storm event. Samples will be analyzed to measure the level of *Enterococcus* bacteria and TSS.

ii. Influent samples will be collected from the influent channel directly above the pumps to the treatment system.

iii. Effluent samples will be collected from the effluent channel directly downstream of the treatment system. Each of these samples will be taken as close in time as reasonably possible to the corresponding sample taken from the treatment system influent.

c. Monitoring of Moat Discharge

i. During each storm event, a minimum of five grab samples will be collected from the moat discharge. Each of these samples will be taken as close in time as reasonably possible to the corresponding samples taken from the treatment system influent and effluent. Samples will be analyzed to measure the level of *Enterococcus* bacteria and TSS.

ii. The Moat discharge samples will be collected from the center of the Moat channel at the end of the retaining wall for the Easton's Beach parking lot.

77. The City shall provide copies of the results of all monitoring conducted under this section of the Consent Decree to RIDEM on a timely basis, with contemporaneous copies to the Citizen Plaintiffs.

## IX. REPORTS ON COMPLIANCE

78. The City shall submit to Plaintiffs the following reports regarding its compliance with this Consent Decree:

a. Beginning with the first calendar quarter following the Effective Date of this Consent Decree and each calendar quarter thereafter for a four-year period, the City shall submit on the thirtieth day of each month following the end of such quarter, a written report, in accordance with Section XV (Form of Notice) of this Consent Decree, regarding the status of its compliance with Section VII (Remedial Measures) of this Decree. After the four-year period, written reports shall be required semi-annually, within 30 days of June 30th and December 31st, until termination of the Decree. Each Compliance Report shall include, at a minimum, the following items:

i. A description of the activities undertaken during the reporting period directed at achieving compliance with this Consent Decree;

ii. An identification of all plans, reports, and other submissions required by this Consent Decree that the Defendant completed and submitted during the Reporting Period;

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 49 of 86 PageID #: 347



iii. A description of the activities the Defendant plans to undertake during the next Reporting Period in order to achieve compliance with this Consent Decree; and

iv. An identification of any noncompliance with the requirements of this Consent Decree. If any noncompliance is reported, the notification shall include the following information:

1) A description of any actions taken or proposed by the Defendant to comply with any lapsed requirements;

2) A description of any factors that tend to explain or mitigate the noncompliance; and

3) The date by which the Defendant will perform the required action.

v. An identification of any violations of the numeric limits in the Newport RIPDES Permit for total residual chlorine, fecal coliform, $BOD_5$, TSS, $BOD_5$ % removal, and TSS % removal at outfall 001A occurring during the reporting period, and, for each such violation, an explanation of the cause of the violation.

b. Beginning January 31, 2012, and annually thereafter, the City shall submit, in accordance with Section XV (Form of Notice) of this Consent Decree, a report (the "CMOM Program Implementation Annual Report") detailing the actions taken by the City during the prior calendar year, or known by the City to have been taken by other parties, to resolve the deficiencies identified in the CMOM Corrective Action Plan. The CMOM Program

Implementation Annual Report shall also include, at a minimum:

i. Lists of each of the following categories of SSO events that occurred during the prior calendar year organized chronologically, including, but are not limited to, all releases with a reasonable potential to reach surfaces waters, as well as any releases of wastewater from the Collection System to public or private property that do not reach waters of the United States, including Building/Private Property Backups. Each of the lists shall include, but need not be limited to, the following information:

1) The date and time(s) when each event was discovered/reported and was stopped;

2) The location by address;

3) The final disposition of the SSO, e.g., whether it discharged to the ground, street, or surface water, including: the name of the water body, street, or intersecting streets nearest the SSO; and, if the release occurred to the ground or street, the name of the nearest downgradient water body or storm water catch basin and the name of the receiving water of the storm sewer system;

4) The source of the notification (e.g., property owner, general public, field crew, police);

5) The cause(s) of the event (e.g., vandalism, sediments, roots, grease, mechanical, electrical and structural failures, capacity issues);

6) A determination of whether the event was caused by blockages or hydraulic limitations within the Collection System;

7) The measures taken to stop the event;

8) The estimated gallons of wastewater released, the estimated gallons of wastewater that reached a surface water, and the bases for those estimates;

9) The date the SSO event was reported to the RIDEM;

10) The date of the last SSO that occurred at the event location; and

11) A GIS map or figure, consistent with the requirements of Paragraph 14 indicating the location of each SSO event including Building/Private Property Backups

79. The reporting requirements set forth in this Section do not relieve the Defendant of its obligation to submit any other reports or information as required by federal, State, or local law or regulation. EPA reserves the right to review and require modifications to the above reporting requirements.

## X. APPROVAL OF SUBMISSIONS

80. After review of any plan, schedule, report, or other item that is required to be submitted for Approval by EPA pursuant to this Consent Decree, EPA shall in writing: (a) approve, in whole or in part, the submission; (b) approve, in whole or in part, the submission with specified conditions; (c) modify, in whole or in part, the submission to cure the deficiencies; (d) disapprove, in whole or in part, the submission, directing that the Defendant modify the submission; or (e) any combination of the above, and shall provide copies thereof to the other Parties.

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 52 of 86 PageID #: 350



81. In the event of Approval, Approval with conditions, and/or modification by EPA pursuant to Paragraph 80(a), (b), or (c), the plan, schedule, report, or other item, or portion thereof, as Approved, Approved with conditions, and/or modified by EPA shall be enforceable under this Consent Decree, and the Defendant shall take all actions required to implement such plan, schedule, report, or other item, or portion thereof, in accordance with the Approval, Approval with conditions, and/or modification issued by EPA.

82. In the event that the Defendant submits a deficient plan, schedule, or other item, and EPA modifies the submission, or portion thereof, to cure the deficiencies pursuant to Paragraph 80(c), Defendant shall remain subject to stipulated penalties, as provided in Section XI (Stipulated Penalties) from the date of the original submission.

83. Upon receipt of a written notice of disapproval pursuant to Paragraph 80(d), the Defendant shall, within thirty (30) Days or such other time as the Defendant and EPA agree in writing, correct the deficiencies and resubmit the plan, schedule, report, or other item, or portion thereof, for Approval. Any stipulated penalties applicable to the original submission shall accrue during the thirty (30)-Day period or other specified period, but shall not be payable unless the resubmission is untimely and/or disapproved as provided in Paragraph 80; provided that, if the original submission was disapproved by EPA in whole, stipulated penalties applicable to the original submission shall be due and payable upon demand notwithstanding any subsequent resubmission.

84. Any resubmitted plan, schedule, report, or other item, or portion thereof, shall be subject to review and Approval by EPA, as provided under this Section. If the Defendant fails to

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 53 of 86 PageID #: 351



resubmit a plan, schedule, report, or other item, or portion thereof after a disapproval, or if, upon resubmission, the plan, schedule, report, or other item, or portion thereof, is disapproved or modified by EPA, the Defendant shall be deemed to have failed to submit such plan, schedule, report, or other item, or portion thereof, timely and adequately, unless the Defendant invokes the dispute resolution procedures set forth in Section XIII (Dispute Resolution) and the Defendant's position is upheld.

85. Notwithstanding the receipt of a notice of disapproval pursuant to Paragraph 80(d), the Defendant shall proceed, at the direction of EPA, to take any action required by any non-deficient portion of the submission. Implementation of any non-deficient portion of a submission shall not relieve the Defendant of any liability for stipulated penalties under Section XI (Stipulated Penalties) for the deficient portions.

## XI. STIPULATED PENALTIES

86. The Defendant shall pay stipulated penalties to the United States and the State for violations of, or noncompliance with, the requirements of this Consent Decree, as set forth below, unless excused under Section XII (Force Majeure). A violation or noncompliance includes failing to perform an obligation required by the terms of this Consent Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules or by the date(s) established by or approved under this Decree:

a. Late Payment of Civil Penalty. If the Defendant fails to pay the Civil Penalty required to be paid under Section VI (Civil Penalty) when due, the Defendant shall pay a

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 54 of 86 PageID #: 352



stipulated penalty as follows:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $ 750 | 1st through 10th Day |
| $ 1,500 | 11th through 20th Day |
| $ 2,500 | 21st Day and beyond. |

b. Reporting & Notice Requirements. For every Day that the Defendant fails timely to submit a report required by Paragraph 78, fails to provide the certification required by Paragraph 110, or fails to provide the Notice required by Paragraph 4 and 5, the Defendant shall pay a stipulated penalty as follows:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $ 750 | 1st through 10th Day |
| $ 1,500 | 11th through 20th Day |
| $ 2,500 | 21st Day and beyond. |

c. Unpermitted Discharges. For each Day that an SSO occurs, the Defendant shall pay a stipulated penalty of $6,500. Notwithstanding the foregoing, the Defendant shall not be liable for such a stipulated penalty prior to implementation of the final remedy under Paragraph 67 of this Consent Decree if all of the following conditions are met: (i) the Defendant stopped the SSO as soon as reasonably practicable; (ii) the Defendant is in full compliance with the schedules and other requirements set forth pursuant to Section VII (Remedial Measures) of this Consent Decree; and (iii) the Defendant has complied with all reporting requirements related to SSO discharges, including but not limited to those set forth in Paragraph 78 of this Consent Decree.

d. Remedial Measures. For every Day that the Defendant fails to timely

meet the requirements of Section VII (Remedial Measures) of this Consent Decree, including but not limited to, submitting an approvable plan, schedule, report, or other item, other than a report required by Paragraph 78, subject to the provisions of Paragraphs 80-85, or fails to implement remedial requirements in a plan, schedule, report, or other item Approved by EPA, the Defendant shall pay a stipulated penalty as follows:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $ 750 | 1st through 10th Day |
| $ 1,000 | 11th through 20th Day |
| $ 2,500 | 21st Day and beyond. |

87. Stipulated penalties shall automatically begin to accrue on the Day after performance is due or on the Day a violation occurs and shall continue to accrue each Day until performance is satisfactorily completed or until the violation or noncompliance ceases. Stipulated penalties shall accrue simultaneously for separate violations of, or instances of noncompliance with, this Consent Decree.

88. Following the United States' or the State's determination that the Defendant has failed to comply with a requirement of this Consent Decree, the United States and/or the State may give the Defendant written notification of the same and describe the noncompliance. The United States and/or the State may send the Defendant a written demand for the payment of the stipulated penalties. If the United States or Rhode Island makes a demand for payment of stipulated penalties, it shall simultaneously send a copy of the demand to Rhode Island or the United States, as applicable. However, the stipulated penalties shall accrue as provided in the preceding Paragraph regardless of whether the United States or the State has notified the

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 56 of 86 PageID #: 354



Defendant of a violation of, or noncompliance with, the requirements of this Consent Decree, or demanded payment of stipulated penalties.

89. The Defendant shall pay stipulated penalties as specified in this Section by delivering the payments to the United States and the State within thirty (30) Days of the date of a demand for payment of stipulated penalties by either Government Plaintiff. The Defendant shall pay fifty (50) percent of the total stipulated penalty amount due to the United States and fifty (50) percent to the State, in accordance with the instructions set forth below:

a. The Defendant shall pay stipulated penalties to the United States in the manner set forth and with the confirmation notices required by Paragraph 10.a, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) or noncompliance the penalties are being paid.

b. The Defendant shall pay stipulated penalties to the State in the manner set forth in Paragraph 10.b.

c. In the event the Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, such penalty (or portion thereof) shall be subject to interest at the statutory judgment rate set forth at 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State from seeking any remedy otherwise provided by law for failure of the Defendant to pay any stipulated penalties.

90. Stipulated penalties shall continue to accrue as provided in Paragraph 87, during any dispute resolution, but need not be paid until the following:

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 57 of 86 PageID #: 355



a. If the dispute is resolved by agreement or a decision of the United States that is not appealed to the Court, the Defendant shall pay accrued penalties determined to be owed, together with interest, to the United States and the State within thirty (30) Days of the Effective Date of the agreement or the receipt of the United States' decision or order.

b. If the dispute is appealed to the Court and the United States prevails in whole or in part, the Defendant shall pay all accrued penalties determined to be owed, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

c. If any Party appeals the District Court's decision, the Defendant shall pay all accrued penalties determined to be owed, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

91. The stipulated penalties set forth above shall be in addition to any other remedies, sanctions, or penalties which may be available by reason of the Defendant's failure to comply with the requirements of this Consent Decree. The Plaintiffs expressly reserve any and all legal and equitable remedies, including contempt sanctions, which may be available to enforce the provisions of this Consent Decree. The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree. Rhode Island may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

## XII. FORCE MAJEURE

92. "Force Majeure," for purposes of this Consent Decree, is defined as any event

arising from causes beyond the control of the Defendant or of any entity controlled by the Defendant, including its engineers, consultants, contractors and subcontractors, that delays or prevents the timely performance of any obligation under this Consent Decree notwithstanding the Defendant's best efforts to fulfill the obligation. Examples of events which may constitute Force Majeure events include natural disasters, national, state or regional emergencies, and delays in obtaining any required approvals or permits despite the City's complete and timely submission of requests for approval and applications for required permits and any supplemental information that may be requested. Examples of events that are not Force Majeure events include, but are not limited to, normal inclement weather, unanticipated or increased costs or expenses of work, the financial difficulty or inability of the City to perform such work, acts or omissions attributable to the City's contractors or representatives, and the failure of the City or the City's contractors or representatives to make complete and timely application for any required approval or permit.

93. The requirement that the Defendant exercise "best efforts" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible. Stipulated Penalties shall not be due for the number of Days of noncompliance caused by a Force Majeure event as defined in this Section, provided that the Defendant complies with the terms of this Section.

94. If any event occurs that may delay or prevent the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, the Defendant shall

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 59 of 86 PageID #: 357



notify Plaintiffs via email within seventy-two (72) hours after the Defendant first knew or should have known that the event might cause a delay. Within five (5) working Days thereafter, the Defendant shall submit for review and Approval by EPA a written explanation of the cause(s) of any actual or expected delay or noncompliance, the anticipated duration of any delay, the measure(s) taken and to be taken by the Defendant to prevent or minimize the delay, a proposed schedule for the implementation of such measures, and a statement as to whether, in the opinion of the Defendant, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Notwithstanding the foregoing, the Defendant shall notify EPA and RIDEM via email within twenty-four (24) hours of becoming aware of any event that presents an imminent threat to the public health or welfare or the environment and provide written notice to Plaintiffs within five (5) working days of discovery of such event. The Defendant shall be deemed to know of any circumstances of which the Defendant, any entity controlled by the Defendant, or the Defendant's contractors knew or should have known. Failure to provide timely and complete notice in accordance with this Paragraph shall constitute a waiver of any claim of Force Majeure with respect to the event in question. Notifications required by this Paragraph shall be provided consistent with the contact information provided in Section XV (Form of Notice). Nothing in this Consent Decree should be taken to change or amend existing reporting requirements established by RIDEM for SSO events and facility upsets.

95. If EPA, after providing RIDEM and the Citizen Plaintiffs (through their respective representatives as designated under Section XV (Form of Notice)) a reasonable opportunity for consultation, agrees that a delay or anticipated delay is attributable to Force

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 60 of 86 PageID #: 358



Majeure, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event shall be extended by EPA for a period of time as EPA determines is necessary to complete these obligations. EPA will notify the Defendant in writing of the length of the extension, if any, for completion of the obligations affected by the Force Majeure event.

96. If EPA does not agree the delay or anticipated delay is attributable to Force Majeure, or on the number of Days of noncompliance caused by such event, EPA will notify the Defendant in writing of its decision. The Defendant may then elect to initiate the dispute resolution process set forth in Section XIII (Dispute Resolution). If the Defendant does not initiate the dispute resolution process set forth in Section XIII (Dispute Resolution) within ten (10) Days of receiving EPA's written notice under this Paragraph, then the Defendant shall be deemed to have waived any Force Majeure claims or any rights to initiate dispute resolution with regard to such claims. In any dispute resolution proceeding, the Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that "best efforts" were exercised to avoid and mitigate the effects of the delay, and that the Defendant complied with the requirements of Paragraphs 92 through 94, above. If the Defendant carries this burden, the delay at issue shall be deemed not to be a violation by the Defendant of the affected obligation(s) of this Consent Decree.

97. Delay in performance of any obligation under this Consent Decree shall not automatically justify or excuse delay in complying with any subsequent obligation or

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 61 of 86 PageID #: 359



requirement of this Decree.

98. Failure of the Defendant to obtain any State or federal grants or loans shall not be considered a Force Majeure event under this Consent Decree.

XIII. DISPUTE RESOLUTION

99. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures set forth in this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. The Defendant's failure to seek resolution of a dispute under this Section shall preclude the Defendant from raising any such undisputed issue as a defense to an action by a Plaintiff to enforce any obligation of the Defendant arising under this Decree. The procedures set forth in this Section shall not apply to actions by a Plaintiff to enforce obligations that the Defendant has not disputed in accordance with this Section. In the event a Party elects to invoke dispute resolution in accordance with this Section, and as permitted by this Decree, with respect to a disapproval, Approval, Approval with conditions or modifications, a Force Majeure determination, a written demand for payment of stipulated penalties, or any other determination made or action taken by EPA pursuant to this Consent Decree, the Party shall do so by giving all other Parties a written Notice of Dispute within ten (10) Days after receipt of such determination. If a Party fails to give such Notice, it shall be deemed to have waived any right to invoke dispute resolution regarding such dispute, and the position advanced by the Government Plaintiff(s) shall be considered binding.

100. Any dispute subject to dispute resolution under this Consent Decree shall first be the subject of informal negotiations. The period of informal negotiations shall be considered to

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 62 of 86 PageID #: 360



have begun when a Party sends all other Parties a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute, and shall be accompanied by a Statement of Position that shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the Party initiating dispute resolution. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement between the parties. If EPA is a party to the dispute, EPA shall maintain an administrative record of the dispute, which shall contain all statements of the Parties, including supporting documentation, submitted pursuant to this Section.

101. If the Parties cannot by informal negotiations resolve a dispute regarding an action or determination by EPA, then the position advanced by the Government Plaintiff(s) shall be considered binding unless, within thirty (30) Days after the conclusion of the informal negotiation period, the Defendant or Citizen Plaintiffs seek judicial review of the dispute by filing with the Court and serving on the other Parties, in accordance with Section XV (Form of Notice), a motion requesting judicial resolution of the dispute. If the Parties cannot by informal negotiations resolve any other dispute, any party to the dispute may, within thirty (30) Days after the conclusion of the informal negotiation period, seek judicial review of the dispute by filing with the Court and serving on the other Parties, in accordance with Section XV (Form of Notice), a motion requesting judicial resolution of the dispute. Any such motion shall contain a written statement of the Party's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule

within which the dispute must be resolved for orderly implementation of the Consent Decree.

102. The other Parties shall file any response to such motion within the time period allowed by the Federal Rules of Civil Procedure and the Local Rules of this Court. The Party filing the motion may file a reply memorandum to the extent permitted by the Federal Rules of Civil Procedure and the Local Rules.

103. Standard of Review.

a. Disputes Concerning Matters Accorded Record Review. Except as otherwise provided in this Consent Decree, any dispute brought under this Section pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules, or any other items requiring Approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, the Party initiating dispute resolution shall bear the burden of demonstrating, based on the administrative record, that the Government Plaintiff(s) position is arbitrary, capricious, not in accordance with this Consent Decree, or otherwise not in accordance with law.

b. Other Disputes. Except as otherwise provided in this Consent Decree, in any other dispute brought under this Section, and in any dispute arising under Section VIII (Stormwater from Easton's Pond Moat), the Party initiating dispute resolution shall bear the burden of demonstrating that its position complies with this Consent Decree and will better serve the objectives of this Consent Decree and that it is entitled to relief under applicable principles of law.

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 64 of 86 PageID #: 362



104. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of the Defendant under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute, as provided in Paragraph 90. If the Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV. RIGHT OF ENTRY/INFORMATION COLLECTION AND RETENTION

105. EPA and RIDEM and their contractors, consultants, and attorneys shall have authority to enter any property or facility owned or controlled by the Defendant, at all reasonable times, upon proper identification, for the purposes of: (a) monitoring the progress of activity required by this Consent Decree; (b) verifying any data or information submitted to EPA or RIDEM under this Consent Decree; (c) assessing the Defendant's compliance with this Consent Decree; (d) obtaining samples and, upon request, splits of any samples taken by the Defendant or its representatives, contractors, or consultants; and (e) obtaining documentary evidence, including photographs and similar data. Upon request, EPA and RIDEM shall provide the Defendant splits of any samples taken by EPA or RIDEM. This requirement is in addition to, and does not limit, the authority of EPA or RIDEM pursuant to the CWA, the Rhode Island Act, or any other provision of State or federal law or regulation.

106. Until five years after the termination of this Consent Decree, the Defendant shall retain all non-identical copies of all documents, records, and other information (including

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 65 of 86 PageID #: 363



documents, records, or other information in electronic form) generated by the Defendant, and all data collected and all reports generated by the Defendant's contractors (including data and reports in electronic form), that relate in any manner to the Defendant's performance of its obligations under this Consent Decree. This information retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, the State, or the Citizen Plaintiffs, the City shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

107. At the conclusion of the information-retention period provided in the preceding Paragraph, the Defendant shall notify the United States and the State at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or the State, the Defendant shall deliver any such documents, records, or other information to EPA or RIDEM. The Defendant may assert that certain documents, records, or other forms of information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If the Defendant asserts such a privilege, it shall provide the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by the Defendant. However, no documents, records, data, reports, or other information created or generated pursuant to the requirements of this

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 66 of 86 PageID #: 364



Consent Decree shall be withheld on grounds of privilege.

108. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State pursuant to applicable federal or State laws, regulations, or permits, nor does it limit or affect any duty or obligation of the Defendant to maintain documents, records, or other information imposed by applicable federal or State laws, regulations, or permits.

## XV. FORM OF NOTICE

109. Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing to the following respective addressees. Any Party may, by written notice to the other Parties, change its designated notice recipient, address, or means of notice (including the substitution of electronic notice via email instead of notice via mail). Notifications, submissions, or communications submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by written agreement of the Parties.

As to the Department of Justice

Chief, Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611 - Ben Franklin Station
Washington, DC 20044
DJ # 90-5-1-1-09855

As to the EPA

David Turin
Enforcement Scientist
Water Technical Unit

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 67 of 86 PageID #: 365



U.S. Environmental Protection Agency, Region 1
5 Post Office Square – Suite 100
Mail Code OES04-4
Boston, MA 02109-3912
turin.david@epa.gov

Tonia Bandrowicz
Senior Enforcement Counsel
Office of Environmental Stewardship
U.S. Environmental Protection Agency, Region 1
5 Post Office Square – Suite 100
Mail Code OES04-1
Boston, MA 02109-3912
bandrowicz.toni@epa.gov

As to the RIDEM

Angelo S. Liberti, PE
Chief of Surface Water Protection
R.I. Department of Environmental Management
Office of Water Resources
235 Promenade Street
Providence, Rhode Island 02908
angelo.liberti@dem.ri.gov

Marisa Desautel
Senior Legal Counsel
Office of Legal Services
R.I. Department of Environmental Management
235 Promenade St.
Providence, RI 02908
marisa.desautel@dem.ri.gov

As to the Citizen Plaintiffs

Ted Wrobel
45 William Street
Newport, RI 02840-3306
twrobel@tacticaltech.com

Charles C. Caldart
National Environmental Law Center
1402 Third Avenue
Suite 715
Seattle, WA 98101
cccnelc@aol.com

David A. Nicholas
20 Whitney Road
Newton, MA 02460
dnicholas@verizon.net

As to City of Newport

Julia A. Forgue, PE
70 Halsey Street
Newport, RI 02840
jforgue@cityofnewport.com

Joseph J. Nicholson, Jr.
43 Broadway
Newport, RI 02840
jnicholson@cityofnewport.com

a. The Defendant shall submit all notifications, submissions, and communications required by this Consent Decree to EPA and RIDEM by both regular and electronic mail no later than the due date(s) specified in this Consent Decree, except that with respect to copies of reports, schedules, and plans submitted pursuant to Sections VII (Remedial Measures) and IX (Reports on Compliance), only copies of the transmittal letters need be provided to Tonia Bandrowcz. If a submission or notice cannot be provided via electronic mail due to its size, an electronic copy shall be provided by CD-ROM or other similar digital format

b. The Defendant shall submit all notifications, submissions and communications required by this Consent Decree to Citizen Plaintiffs by electronic mail no later

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 69 of 86 PageID #: 367



than the due date(s) specified in this Consent Decree. If a submission or notice cannot be provided via electronic mail due to its size, an electronic copy shall be provided by CD-ROM or other similar digital format. The Defendant shall not be required to provide Citizen Plaintiffs with a hard copy of any notifications, submissions, or communications unless such hard copy is requested.

c. The Defendant shall provide EPA and Citizen Plaintiffs with copies of its Discharge Monitoring Reports ("DMRs") at the time it submits them to RIDEM, shall identify any violations of the numeric limits in the Newport RIPDES Permit for fecal coliform, TRC, $BOD_5$, TSS, $BOD_5$ % removal, and TSS % removal at outfall 001A occurring during the reporting period, and, shall, for each such violation, provide an explanation of the cause of the violation.

110. All written notices, reports, or any other submissions required of the Defendant by this Consent Decree shall contain the following certification by a duly authorized representative of the Defendant:

> "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## XVI. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

111. This Consent Decree resolves the civil claims of the United States, the State, and

Citizen Plaintiffs for the violations alleged in their respective Complaints filed in this action through the Date of Lodging, and deficiencies described in the letter from RIDEM to Newport on December 17, 2010 regarding RIDEM's December 6, 2010 Compliance Evaluation Inspection (included in Attachment No. 3).

112. This Consent Decree is neither a permit nor a modification of any existing permit under any federal, State, or local law or regulation. The Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws and regulations, and permits, and the Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The Plaintiffs do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that the Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA or the Rhode Island Act or with any other provisions of federal, State, or local laws, regulations, or permits. This Consent Decree shall not be construed to constitute EPA or RIDEM approval of any equipment or technology installed by the Defendant under the terms of this Consent Decree.

113. This Consent Decree does not limit any rights or remedies available to the Plaintiffs for any violation by the Defendant of the CWA, the Rhode Island Act, or associated regulations or permit conditions other than those claims alleged in the Complaints through the Date of Lodging. This Consent Decree does not limit any rights or remedies available to the United States or the State for any criminal violations. The Plaintiffs expressly reserve all rights and remedies, legal and equitable, available to each of them for all violations of the CWA, the

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 71 of 86 PageID #: 369



Rhode Island Act, or other applicable law, except with respect to violations that have been specifically resolved pursuant to Paragraph 111, and reserve all rights and remedies, legal and equitable, available to enforce the provisions of this Consent Decree. Nothing herein shall be construed to limit the power of the United States or the State, consistent with their respective authorities, to undertake any action against any person, in response to conditions which may present an imminent and substantial endangerment to the public's health or welfare, or the environment. The Plaintiffs reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 111.

114. In any subsequent administrative or judicial proceeding initiated by one or more of the Plaintiffs for injunctive relief, civil penalties, or other appropriate relief relating to the Defendant's violations of federal or State law, the Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by one or more of the Plaintiffs in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 111.

115. This Consent Decree does not resolve any claims for contingent liability under Section 309(e) of the Clean Water Act, 33 U.S.C. § 1319(e). The United States specifically reserves any such claims against the State, and the State specifically reserves all defenses to any such claims.

116. This Consent Decree does not limit or affect the rights of the Defendant, or the

Plaintiffs against any third parties not party to this Consent Decree, nor does it limit the rights of third parties not party to this Consent Decree against the Defendant, except as otherwise provided by law.

117. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

XVII. COSTS

118. Each Party shall bear its own expenses, costs, and attorney's fees in this action, except that, within 30 days after the Court's entry of this Decree, Defendant shall, in accordance with law, pay $70,000 to counsel for Citizen Plaintiffs pursuant to 33 U.S.C. § 1365(d) for costs of litigation (including reasonable attorney and expert witness fees). The Defendant shall be responsible for all expenses, costs and attorney's fees incurred by Plaintiffs in collecting any penalties due and payable under Sections VI (Civil Penalty) and XI (Stipulated Penalties) of this Consent Decree or to enforce any obligation of this Consent Decree. In no event shall Plaintiffs be responsible for any expenses, costs or attorney's fees incurred by the Defendant.

XVIII. EFFECTIVE DATE

119. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that the Defendant hereby agrees that it shall be bound to perform duties scheduled to occur prior to the Effective Date. In the event the United States withdraws or withholds consent to this Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform

duties scheduled to occur before the Effective Date shall terminate.

## XIX. RETENTION OF JURISDICTION

120. The Court shall retain jurisdiction to modify and enforce the terms and conditions of this Consent Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction or execution of this Consent Decree and to assess any stipulated penalties that may have accrued because of the Defendant's failure to comply with any of its obligations under this Decree.

## XX. MODIFICATION

121. The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the United States, Rhode Island, Citizen Plaintiffs, and the Defendant, including modifications to the schedule specified in the Consent Decree and any attached appendices. Where the modifications constitute a material change to the Consent Decree, it shall be effective only upon approval by the court. Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 103, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXI. FUNDING

122. Performance of the terms of this Consent Decree by the Defendant is not conditioned on the receipt of any federal or State grant funds or loans, or other financing. In addition, performance is not excused by the lack of federal or State grant funds or loans.

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 74 of 86 PageID #: 372



## XXII. SEVERABILITY

123. The provisions of this Consent Decree shall be severable, and should any provision be declared by a court of competent jurisdiction to be unenforceable, the remaining provisions shall remain in full force and effect.

## XXIII. TERMINATION

124. After the Defendant completes all of the requirements of Section VII (Remedial Measures) and Section IX (Reports on Compliance), complies with all other requirements of the Consent Decree, has paid in full the Civil Penalty, and all accrued interest thereon, and all stipulated penalties, and all accrued interest thereon, as required by Sections VI (Civil Penalty) and XI (Stipulated Penalties) of this Consent Decree, has paid in full the costs of litigation, and all accrued interest thereon, as required by Paragraph 118 of this Consent Decree, and has demonstrated and certified that it has maintained substantial compliance with the Newport RIPDES Permit and the General Storm Water Permit for a period of 12 continuous months following completion of the measures required by Paragraphs 65 through 67 of this Consent Decree, the Defendant may serve upon the Plaintiffs a Request for Termination, stating that the Defendant has satisfied those requirements, together with all applicable supporting documentation.

125. Following receipt by the Plaintiffs of the Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that they may have as to whether the Defendant has satisfied the requirements for termination of this Consent Decree. The Plaintiffs shall consult as to whether Defendant has satisfied the requirements for

Termination contained in paragraph 124 above. If the Plaintiffs agree that this Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree. If EPA, the State, or the Citizen Plaintiffs do not agree that this Consent Decree may be terminated, Defendant may invoke the Dispute Resolution provisions of this Decree.

## XXIV. FINAL JUDGMENT

126. Entry of this Consent Decree constitutes Final Judgment under Rule 54 of the Federal Rules of Civil Procedure.

## XXV. WAIVER OF SERVICE

127. The Defendant hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXVI. PUBLIC COMMENT

128. This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments received disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate. The Defendant, Citizen Plaintiffs, and Rhode Island consent to the entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of this Decree, unless the United States has notified the parties in writing that it no longer supports entry of this Decree.

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 76 of 86 PageID #: 374



129. The City has established a CSO Program Stakeholder Workgroup composed of a broad cross section of representatives of the Newport Community, including Ted Wrobel. Its task is to support the City with public education activities associated with the City's Long Term CSO Plan and to review proposed plans and projects for the CSO Program and provide recommendations to the City about the potential benefits and impacts of the proposed plans and projects to City businesses, residents, and other stakeholders. This stakeholder group and process is specifically incorporated into this Consent decree as a part hereof.

## XXVII. SIGNATORIES

130. Each undersigned representative of the Defendant, Citizen Plaintiffs, and Rhode Island, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

## XXVIII. INTEGRATION

131. This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

132. This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supercedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than submissions that are subsequently submitted and Approved by EPA pursuant to this Decree, no other document, nor any representation,

inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

Judgment is hereby entered in accordance with the foregoing Consent Decree this 18th day of October 2011.

WSmith

Hon. William E. Smith
UNITED STATES DISTRICT JUDGE
District of Rhode Island

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 78 of 86 PageID #: 376

THE UNDERSIGNED PARTY enters into Consent Decree in the matter of *Environment Rhode Island. et al. United States of America, and State of Rhode Island v. City of Newport.*

For Defendant CITY OF NEWPORT

7/27/11
Date

STEPHEN C. WALUK, Mayor
City Hall, 43 Broadway
Newport, RI 02840
Tel No. (401) 845-5436
Telefax No. (401) 845-2510
Email: swaluk@cityofnewport.com

7/28/11
Date

JOSEPH J. NICHOLSON, JR.
City Solicitor
City Hall, 43 Broadway
Newport, RI 02840
Tel No. (401) 845-5423
Telefax No. (401) 847-1074
Email: jnicholson@cityofnewport.com

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *Environment Rhode Island, et al. United States of America, and State of Rhode Island v. City of Newport.*

For Plaintiff UNITED STATES OF AMERICA

Environment and Natural Resources Division
United States Department of Justice

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

DATE: 8/8/2011

JEROME W. MACLAUGHLIN
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044
(202) 616-7162
jerry.maclaughlin@usdoj.gov

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 80 of 86 PageID #: 378

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *Environment Rhode Island, et al. United States of America, and State of Rhode Island v. City of Newport.*

For Plaintiff UNITED STATES OF AMERICA

PETER F. NERONHA
United States Attorney
District of Rhode Island

LY T. CHIN
Assistant United States Attorney
District of Rhode Island
Fleet Center, 50 Kennedy Plaza, 8th Floor,
Providence, Rhode Island 02903

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *Environment Rhode Island, et al. United States of America, and State of Rhode Island v. City of Newport.*

For the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Susan Studlien ______________________ 07/28/11 ________
SUSAN STUDLIEN Date
Director, Office of Environmental Stewardship
U. S. Environmental Protection Agency, Region 1
5 Post Office Square – Suite 100
Boston, Massachusetts 02109-3912

Tonia Bandrowicz (EAG) ______________________ 7/27/11 ________
TONIA BANDROWICZ Date
Senior Enforcement Counsel
Office of Environmental Stewardship
U.S. Environmental Protection Agency, Region 1
5 Post Office Square – Suite 100
Boston, Massachusetts 02109-3912

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 82 of 86 PageID #: 380

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *Environment Rhode Island, et al. United States of America, and State of Rhode Island* v. *City of Newport*.

For the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

_______________________________ 8/4/11
Date

Adam M. Kushner
Director, Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

_______________________________ 8/4/11
Date

Mark Pollins
Director, Water Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

_______________________________ 8/1/11
Date

James J. Vinch
Attorney, Water Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *Environment Rhode Island, et al. United States of America, and State of Rhode Island v. City of Newport*.

For Plaintiff-Intervenor STATE OF RHODE ISLAND, on behalf of Janet L. Coit as Director of the Rhode Island Department of Environmental Management

Marisa Desautel (R.I. Bar No. 7556)
Senior Legal Counsel
Office of Legal Service
R.I. Department of Environmental Management
235 Promenade St.
Providence, RI 02908

7.25.11
Date

Angelo S. Liberti, PE
Chief of Surface Water Protection
Office of Water Resources
R.I. Department of Environmental Management
235 Promenade St.
Providence, RI 02908

July 25, 2011
Date

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *Environment Rhode Island, et al. United States of America, and State of Rhode Island v. City of Newport.*

BURTON HOFFMAN [DECEASED]

Bonnie J. Watson, Esq. under Power of Attorney
HENRY ROSEMONT, JR.

7-24-11
Date

David Wixted
DAVID WIXTED

July 24, 2011
Date

H T Wrobel
HENRY T. WROBEL

7/24/11
Date

Case 1:08-cv-00265-S -DLM Document 34-1 Filed 08/11/11 Page 85 of 86 PageID #: 383

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *Environment Rhode Island, et al. United States of America, and State of Rhode Island v. City of Newport.*

For Plaintiff ENVIRONMENT RHODE ISLAND

________________________________________

John Rumpler
Senior Attorney

For Plaintiffs ENVIRONMENT RHODE ISLAND, BURTON HOFFMAN, HENRY ROSEONT, JR., DAVID WIXTED, AND HENRY T. WROBEL

Karen Pelczarski (RI Bar No. 3357)
Blish & Cavanagh LLP
30 Exchange Terrace
Providence, RI 02903
(401) 831-8900 (phone)
(401) 751-7542 (fax)

7/25/11
Date

Charles C. Caldart (Admitted Pro Hac Vice)
National Environmental Law Center
1402 Third Avenue
Suite 715
Seattle, WA 98101
(206) 568-2853 (phone)
(206) 568-2858 (fax)

David A. Nicholas (Admitted Pro Hac Vice)
20 Whitney Road
Newton, MA 02460
(617) 964-1548 (phone)
(617) 663-6233 (fax)